[Civ. No. 23328.   Second Dist., Div. One.   Oct. 5, 1959.]

THOMAS HOPE, Appellant, v. ARROWHEAD AND PU-
RITAS WATERS, INC. (a Corporation), Respondent.

Cowan & Peterson for Appellant.

Chase, Rotchford, Downen & Drukker and Alan W. Ford for Respondent.

LILLIE, J.—Plaintiff claims personal injuries as a result of having been struck from the rear by one of defendant's fork lift trucks while standing in the loading yard of the Arrowhead and Puritas Waters, Inc. Pacific Indemnity Company, carrier under a contract of Workmen's Compensation insurance, filed a complaint in intervention. A jury trial resulted in a verdict in favor of defendant. Plaintiff Hope appeals from the judgment and order denying him a new trial.

Bound by the rule that a reviewing court must look to the evidence favorable to the finding or verdict, and to inferences reasonably deducible therefrom, when ascertaining the sufficiency of the evidence (*Guerra* v. *Balestrieri,* 127 Cal.App. 2d 511 [274 P.2d 443]), we briefly summarize the pertinent facts leading up to the impact.

Defendant, a water bottling plant, maintains a loading yard covering approximately one block in the middle of which stands a small office. In the area behind the building are stacked wooden crates of bottles and a shed to which small fork lift trucks drive back and forth moving filled and unfilled water bottles from place to place in the yard. Beneath the overhang of the shed is the tilting area in which conveyor belts bring filled bottles out of the filling room and return the empty

ones for sterilization. As five filled bottles approach the end of the belt they are picked up by a hand truck and wheeled onto a wooden pallet. Two fork lift trucks on one side of the tilting area pick up the pallets and, on the other, two trucks return empty bottles. The loading and unloading process is one continuous operation and, along the length of the shed, four fork lift trucks constantly drive in and out of the openings and runways. These vehicles are gas driven and have two large tines in the front which pick up the pallets stacked with cartons of bottles 21 inches high. Approximately $4\frac{1}{2}$ feet wide, the trucks carry in front, approximately 4 to 6 inches off the ground, a full load—three bottles wide, two deep and five high—measuring $3\frac{1}{2}$ feet across. The fully loaded truck weighs approximately 1950 pounds. When the truck is empty the operator, seated on the left side, can see directly ahead; when it carries a full load he cannot see immediately in front but can see ahead some distance away. To load at the tilting area, the operator drives into one of the driveways or runways, swings around to the left, runs the tines between top and bottom of the pallet, backs away, and then moves forward into the driveway and out of the tilting area, transporting empty and full bottles from place to place in the yard in a continuous loading and unloading operation. One fork lift truck every minute emerges from, or goes into, the driveway in the tilting area. With two trucks picking up full loads on one side and two on the other returning empty bottles, there are four such trucks in operation in that area all the time. It takes two minutes for a truck to complete the cycle (drive into the runway, pick up the pallet, back up and drive into the yard to deposit its load). The yard is noisy from the operation of belts, fork lifts and engines. On either side of the gate leading into defendant's premises are two signs: "Stop. Loading area. Co. vehicles only."

At approximately 9 a. m. on January 25, 1956, plaintiff, 49 years of age and an experienced truck driver, drove a truck onto defendant's premises to deliver salt for his employer. He parked on the right side of the driveway next to the yard office, near one of defendant's transport trucks. Having never been on the premises before, he went into the office to inquire where to dump the salt and was told to wait until a place was cleared for it. It was raining heavily. He returned to his truck and waited in the cab approximately one hour. The truck faced the tilting area where the loading and unloading

operations of the fork lift trucks were taking place. He observed the activity around him and saw fork lift trucks moving crates from the area he was waiting for them to clear, and carrying loads of filled bottles to the transport truck near him. He was not otherwise engaged and had a clear view of what went on before him. Since 8:05 a. m. five fully loaded fork lift trucks had been moving about plaintiff's truck in a continuous operation, four working in the tilting area cutting across directly in front of him going to and from the area, and one clearing the place for the salt and loading the transport truck. After an hour's wait, plaintiff backed into the cleared space, unloaded the salt, got out of his truck and went into the yard office to have his bill signed. There being no one in the office, he walked into the yard and stopped in one of the truck runways with his back to the loading activity, looking away from the tilting area. While standing there, a loaded fork lift truck, going about one mile an hour, approached him from the rear and hit him in the ankles. He fell forward on his hands and knees, but immediately got up and limped away. Plaintiff did not see the truck before he was struck.

Experienced with fork lift trucks since 1949, the operator had been driving in and out of the tilting area that day since 8:05 a. m. and in a loaded truck had cut across back and forth in front of the truck in which the plaintiff had been seated. A few minutes before the impact, as he drove into the tilting area for another load, he had seen plaintiff in the yard office through the window. He swung to the left around to the pallet, picked it up, backed around, going "very slow," a mile or a mile and a half an hour, put the truck in gear and about 15 feet from the edge of the overhang started forward approximately one mile an hour headed straight across into the storage yard to set down his load. The load he carried in front of him, approximately 5, 6 or 7 inches off the ground, was the normal load of five bottles high, three wide and two deep. He testified: "First when I backed out I looked backwards to see if there was a lift truck behind me. Naturally when a person backs up, you have to look back. Then as I straightened out I seen no one." Although it was raining and fairly dark two strings of artificial lights were burning under the overhang. The operator was on the watch for other fork lift trucks. The area was empty but, as he straightened out, his vision forward was obscured by the load. He could see "to some extent" toward the left but could not see "very

good'' off to the front right. When driving out he could see a ''considerable distance'' beyond him but not immediately in front, the top of the load being higher than the level of his eyes. He estimated a man almost 6 feet tall would have to be 5 or 6 feet in front of the loaded truck for him to see any part of his head. Starting forward about one mile an hour ''(S)omebody yelled. They said 'Whoa.' '' When he heard this he immediately put his foot on the brake causing the fork lift to automatically go forward and downward. After he stopped, he got off the truck and saw plaintiff walking away. He did not see plaintiff either immediately before or at the time of the impact.

Appellant contends first that there was not sufficient evidence of contributory negligence to sustain the verdict; and assigns as error three rulings made by the trial court to objections to the use of certain doctors' reports in the cross-examination of expert medical witnesses.

█ The judgment having been based on a general verdict, we are unable to speculate on what particular ground the jury may have found against plaintiff, nor are we required to do so. A general verdict imports findings in favor of the prevailing party on all material issues (*Moss* v. *Coca Cola Bottling Co.*, 103 Cal.App.2d 380 [229 P.2d 802]; *Shields* v. *Oxnard Harbor Dist.*, 46 Cal.App.2d 477 [116 P.2d 121]); therefore we may assume the jury found that defendant exercised due care and it was not negligent; or, if defendant was negligent, its negligence was not a proximate cause of the alleged injury; or, if defendant's negligence was a proximate cause of the accident, plaintiff's own negligence contributed as a proximate cause thereof. Had the jury found against plaintiff on any one of these issues, and if there is substantial evidence in the record before us to support such an implied finding, the judgment must be sustained if the record is otherwise free from error. As the trier of fact which weighed the evidence, determined the credibility of witnesses and resolved the factual conflicts, the jury no doubt was influenced by the various omissions and evasions manifest in plaintiff's testimony, by impeaching evidence concerning a series of other accidents and injuries suffered by plaintiff, by conflicting testimony relative to the nature, extent and seriousness of plaintiff's condition, and by certain contradictory claims concerning his ability to work after a second accident.

█ Appellant has directed our attention solely to the matter of a purported implied finding of the jury relating to his

contributory negligence. Our review of the record admits no merit to his claim that the evidence "is insufficient from which a reasonable person could infer any (contributory) negligence," citing *Gray* v. *Brinkenhoff*, 41 Cal.2d 180 [258 P.2d 834]. This case is of little value to him for therein the violation of a statute, and thus negligence, as a matter of law, was the controlling factor; and the judgment for defendant was reversed on the theory that as a matter of law there was no contributory negligence on the part of plaintiff, and defendant was negligent as a matter of law for his violation of section 560, subdivision (a), Vehicle Code. In the instant case there is involved no issue of negligence as a matter of law, no statute or ordinance and no public street which would make the standard of care established by the Vehicle Code controlling.

It is clear from the record that plaintiff, while on defendant's premises, was struck from the rear by a loaded fork lift truck and that neither plaintiff nor the operator saw the other immediately prior to the impact. The evidence also establishes plaintiff's long experience as a truck driver and in numerous loading yards; his previous familiarity with fork lift trucks and their operation; and his knowledge, based upon personal observation both for a period of years in loading yards and specifically in defendant's yard immediately before the accident, that they operate "blind" when carrying a full load in front. Defendant conducted a private business on private property maintaining a yard devoted primarily to the continuous operation of loading and unloading, involving at least four or five fork lift trucks going in and out of runways up and down the yard all the time. By the very nature of the load transported and the manner in which it was carried, the normal operation of fork lift trucks includes the operator's limited vision of what is immediately in front. No doubt it was due to the character of this operation, the speed with which it was carried on, the type of loading activities involved, and the continuous heavy flow of fork lift truck traffic in the area that caused defendant to post two warning or cautionary signs at either side of the entrance: "Stop. Loading area. Co. Vehicles only." Plaintiff should have known from his experience in loading yards, his long familiarity with fork lift truck operations obtained from personal observation on defendant's premises and elsewhere, the purpose of his visit, the nature and extent of the activities he observed in defendant's yard the hour he sat in his truck, the potential danger and risk arising out of such continuous

activity and heavy flow of traffic, the warning signs posted on either side of the entrance, the noise in the yard, the busy activity in the runways leading in and out of the shed and the inclement weather, that it would be unsafe to stand ir the travelled area used by trucks driving in and out, loading and unloading, with his back to the operations and oncoming traffic, looking away without regard to trucks he must have known were approaching. The jury could well have concluded from the evidence that had plaintiff been an ordinarily prudent person he would have known he was placing himself in a position of danger when he left the safety of his truck and the yard office and walked into the area where he had observed trucks operating; and that he was negligent in standing in a runway with his back to defendant's loading operations, looking away from the traffic.

Appellant's remaining contentions relate to the use of the report of one doctor in the cross-examination of another, in support of which he cites *Buchanan* v. *Nye*, 128 Cal.App.2d 582 [275 P.2d 767], a case clearly inapplicable to the situation at bar. Therein plaintiff's counsel, a lay witness, testified he did not wish to call as a witness on behalf of his client one Sosic because he could not vouch for him, partly because of a statement he had made to a police officer and contained in the officer's report. On cross-examination, Sosic's statement was read into the record in the form of a question. It is apparent from the court's language that its ruling that it was improper was limited to the particular situation. It said at page 585: "(t)he fundamental question is whether, under the guise of cross-examination of an opposing attorney on the latter's reason for not calling a witness deemed unreliable, counsel may read into evidence a written hearsay statement of the absent witness." In the instant case, an entirely different rule applies to the cross-examination of an expert witness relative to his opinion and its sources, which is controlled by statute (Code Civ. Proc., § 1872).

His first claim is that the trial court erred in overruling appellant's objection to the use of Dr. Jones' report in the cross-examination of Dr. Jacobus. After testifying for plaintiff concerning his evaluation of him as a patient and his diagnosis of his condition, Dr. Jacobus, an orthopedic specialist who treated plaintiff, was asked by defense counsel on cross-examination if he had received a report from Dr. Jones (a neurosurgeon who had examined plaintiff at the request of plaintiff in intervention). He not only answered in

the affirmative, but said he took Dr. Jones' report into consideration in forming his opinion concerning his evaluation. When counsel continued to cross-examine Dr. Jacobus by quoting from Dr. Jones' report, plaintiff's objection on the ground of hearsay was overruled. After Dr. Jacobus admitted he not only considered the report in arriving at his evaluation but used it in making his diagnosis, counsel quoted from it Dr. Jones' opinion that the primary diagnosis of plaintiff was that of "malingering" and "exaggerating and simulating" in respect to the left leg and back, and asked Dr. Jacobus if he took this into consideration, too. He answered affirmatively. It is obvious from a reading of the entire testimony of Dr. Jacobus that he not only took Dr. Jones' report into consideration in forming his opinion relative to an evaluation of plaintiff as a patient and in making his diagnosis, but to some extent Dr. Jones' findings had an influence on Dr. Jacobus' treatment of plaintiff.

In forming his opinion an expert is not confined to his own experience or facts personally known or observed by him, but may take into consideration the products of his education and study of his profession. Although textbooks are generally inadmissible as hearsay, a doctor may give an opinion based in part on his study thereof (*Healy* v. *Visalia, etc. R. R. Co.*, 101 Cal. 585 [36 P. 125] ; *Forrest* v. *Fink*, 71 Cal.App. 34 [234 P. 860]) ; a doctor may testify to the history of an accident given him by a patient for the purpose of showing the basis for his opinion on injuries (*Tierney* v. *Charles Nelson Co.*, 19 Cal.App.2d 34 [64 P.2d 1150]) ; and even though the opinion of an expert cannot be predicated on that of another, it is proper for an expert to express his own opinion based on facts testified to by another expert or on tests made by other experts (*Christiansen* v. *Hollings*, 44 Cal.App.2d 332 [112 P.2d 723]).

Once an expert offers his opinion, however, he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, the reasons for his opinion including facts and other matters upon which it is based (Code Civ. Proc., § 1872), and which he took into consideration; and he may be "subjected to the most rigid cross examination" concerning his qualifications, and his opinion and its sources (*Forrest* v. *Fink*, 71 Cal.App. 34, 41 [234 P. 860]). It is proper to draw from an expert testimony showing whether he has relied on

or considered any authority in formulating his opinion and, if he has done so, to confront him with it if it contradicts him (*Douglas* v. *Berlin Dye Works & Laundry Co.,* 169 Cal. 28 [145 P. 535]) ; and to cross-examine him on any books he may have used in forming it (*Lewis* v. *Johnson,* 12 Cal.2d 558 [86 P.2d 99] ; *People* v. *Hooper,* 10 Cal.App.2d 332 [51 P.2d 1131] ; *Gluckstein* v. *Lipsett,* 93 Cal.App.2d 391 [209 P.2d 98] ). ▮▮▮ Having expressed an opinion concerning his diagnosis and evaluation of plaintiff's condition and having taken, among other things, Dr. Jones' report into consideration, Dr. Jacobus was without doubt properly subject to cross-examination concerning it.

Of interest in this connection is the fact that Dr. Jones was subsequently called by the court to appear as a witness "because some mention was made of his report"; and he did so, sponsored by defendant. Plaintiff cross-examined him and had ample opportunity to fully question him concerning his report. He did not do so. This appears to render ineffective the "hearsay" argument suggested by appellant in his quote from *Buchanan* v. *Nye,* 128 Cal.App.2d 582, at page 585 [275 P.2d 767] : "the question placed before the jury the clearly hearsay testimony of a witness unavailable for cross-examination. . . ."

▮▮▮ The foregoing applies with equal force to appellant's claim that the trial court committed prejudicial error in permitting defense counsel to read excerpts from Dr. Jones' report in his cross-examination of Dr. Erickson. We are unable to determine from the record whether Dr. Erickson considered Dr. Jones' report in formulating his opinion. However, even had he not, we find no prejudice to plaintiff, since the greater portion of Dr. Jones' report had already been read to the jury on the cross-examination of Dr. Jacobus prior to any testimony having been given by Dr. Erickson. Moreover, Dr. Jones' report lost its "hearsay" nature when he was made available for plaintiff's cross-examination.

▮▮▮ Nor is there merit to appellant's final contention that there was prejudicial error in permitting defense counsel to read excerpts from the report of Dr. Brockman in the cross-examination of Dr. Erickson. Dr. Erickson was plaintiff's principal treating physician, who testified he remembered that Dr. Brockman (a psychiatrist and neurologist) examined plaintiff at the request of plaintiff in intervention. At one point in Dr. Erickson's cross-examination, when asked if he had the benefit of Dr. Brockman's report and findings, he

said "I believe I have read this report," then he expressed doubt concerning it; and at another place, "I don't believe I have read this before." Plaintiff's objection to the use of the report was overruled. An apparent conflict existed in Dr. Erickson's testimony concerning his consideration of Dr. Brockman's report and we can only assume in view of his ruling that the trial judge accepted the doctor's first statement and rejected his last.

Appellant's opening brief leaves the impression that a considerable portion of the report was read to the jury. Actually, because it was illegible, defense counsel finally, at the direction of the court, abandoned his efforts to cross-examine Dr. Erickson concerning it, and the report was neither used nor read. Beyond the mention therefrom of a few scattered disconnected words and phrases such as "depressive reaction," "chronic," "moderate," "mild," "anxiety," "myospasm" and "tension pains," the content of the report was not disclosed, for it was obvious that neither counsel nor Dr. Erickson could decipher or interpret the words, and the court in halting further reference thereto finally said, "The jury must not speculate, and in the absence of a report that is understandable without speculation the objection would have to be sustained." The words or terms referred to by counsel in an effort to have Dr. Erickson identify them preparatory to reading the report, were taken entirely out of context, and no attempt was made to connect them up. The attempt to decipher the words so the report could be used resulted in neither advantage nor loss—the defendant certainly was not benefited by what occurred, nor can we see how the plaintiff was in any manner prejudiced. The only reasonable deduction the jury could make from defense counsel's unsuccessful attempt was that the report was so illegible no one could read or interpret it, and the judge did not want the jury to consider it. We assume, in view of the court's statement to that effect and the subsequent abandonment of its use, the jury gave no consideration to the report. We fail to appreciate how plaintiff under these circumstances could have been prejudiced within the meaning of article VI, section 4½, California Constitution.

For the foregoing reasons the judgment is affirmed and the attempted appeal from the order denying new trial is dismissed.

Fourt, Acting P. J., and Shea, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.