[Crim. No. 8870. Second Dist., Div. Two. Mar. 16, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES ALEXANDER JONES, Defendant and Appellant.

600

George V. Denny III, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—This is an appeal from the judgment of conviction entered against appellant after a jury trial upon a charge that "he did willfully, unlawfully, feloniously and with malice aforethought murder Pamela Miller, a human being." The jury found that the murder was of the second degree and that appellant was sane at the time of its commission.

The evidence, which is essentially without conflict, established that for several years appellant had been a frequent visitor at the residence occupied by the deceased Pamela Miller, her mother and her eight siblings. Appellant, who was 46 years of age, admitted to police officers that he had had sexual relations with the 12-year-old victim. This admission was corroborated by the autopsy surgeon to the extent that he testified that the girl's hymen had been torn and that her vaginal opening admitted two fingers easily.

The girl's mother testified that her daughter left for school on the morning of March 27, 1962. She returned shortly thereafter and explained to her mother why she had returned. While they were conversing, appellant came into the house. The mother told him that her daughter had informed her that appellant had been "driving slow, real slow, behind her on the way to school" and this was why she had returned home. She asked appellant why he had been following the girl and what he was doing in the neighborhood at that time of morning.

Although denying the implied motive for his conduct, appellant tacitly confirmed the reported actions by stating, "I wasn't following her. There was some people that lived up near the school I had to pick up to take to the unemployment office and that was why I was in the neighborhood at that time."

The mother stated that she then advised appellant, "I told you some time ago, don't pick on the children and don't take them to school. I don't care if it is raining or what, don't go unless I give you permission first." She testified further that she had not given him permission to take her daughter with him and that she told him "to stay away from her." This was the first time she had told appellant that her daughter had complained about him. She then accompanied the girl to school herself.

Approximately a half hour after the girl returned from school that day, appellant again entered the house. The girl was watching television. Because of her poor eyesight, she was seated in a chair near the set as was her custom. Appellant sat down on the bed behind her. The mother, who was in the kitchen preparing dinner, heard appellant telling her daughter to move so that he could see the screen. The mother came out of the kitchen and advised appellant that the television set was hers, that her daughter could watch it in any fashion she chose, and that she did not have to move.

After the mother returned to the kitchen she heard appellant again ordering her daughter to move. The mother again informed appellant that he could move as easily as the girl. She testified that she did not recall ever having heard appellant talk to the girl before regarding sitting so near the set and that it was the first time she ever heard him yelling or raising his voice in speaking to her daughter.

After the mother again had rebuked appellant, he suddenly stood up and told her, "I am going to take her to my

home. Don't call the police.'' The mother told him she would call the police, and, picking up her youngest child, she ran to the home of her neighbors.

Appellant "snatched" the girl out of the chair so violently that it fell over. He held her closely and forced her to go out to his car. He placed her in the car on the driver's side. She immediately slid across the seat and leaped out on the opposite side. Appellant followed her. Apparently he had picked up a knife that was on the front seat, for when he caught her at the rear of the car, he seized her by the hair and stabbed her six times. Three incised wounds were also inflicted. After wielding the knife, appellant threw the girl to the ground and kicked her. The stab wounds in the neck and back penetrating both lungs caused her death.

A neighbor who witnessed the assault testified that he picked up a board and approached appellant in an attempt to stop him. After appellant had stabbed the girl, he advanced on this witness with the knife in his hand challenging him to "come on." When the witness failed to retreat and other neighbors appeared on the scene, appellant fled to his car and drove away.

On the following day, the automobile was located at the place where appellant had abandoned it. The ignition keys were concealed under a seat protector and a butcher knife with a rusty blade was found in the car. Appellant was taken into custody six weeks later. In his statement to the police, he substantially confirmed the events immediately preceding the killing as reported by the victim's mother. He stated that after the killing, he threw away the murder weapon. After changing his coat he abandoned the car, traveled via Long Beach, San Diego and Yuma, Arizona, to Boyser, Louisiana. He said that he had intended to go on to Florida, but that the integration problems existing there discouraged him. In Louisiana he obtained a social security card under another name and gave his address as Phoenix, Arizona. Thereafter, he worked his way back to Los Angeles where he was apprehended.

Appellant's statements regarding the actual killing that followed his placing the girl in his car were as follows: "Q. What did she do, slide over? A. Slid over and I followed her in and when she slid over, she opened the door and started to get out. And I didn't even pay too much attention that the knife was over there, and it looked like she was going to grab it, and she threw her arms up and I think the knife slashed

her arms, and I was dumfounded, and I saw blood come, and she just started screaming and fighting. Q. Did she say anything? A. She said, 'Oh.' And that's all I ever remember her saying. Q. That was one of the times you stabbed her? A. I don't know I stabbed her because she had her back turned to me. I was trying to hold her and I had the knife in my hand, too, and I think something happened and I think she fell or something. I grabbed her back and she fell over and I just went crazy. I don't remember what all I did. I was scared and I was just—my mind was just about gone.'' He also sought to explain the presence of the murder weapon by stating that he was "working on the car with some kind of a butcher knife.''

Since the recited circumstances of the killing are conceded, it is obvious that the evidence is sufficient to support the verdict. ■■ When the killing is proved to have been committed by appellant and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree. (*People* v. *Wells*, 10 Cal.2d 610, 617 [76 P.2d 493].) ■■ The burden of proving circumstances in mitigation is on the appellant. (*People* v. *Wells, supra*, at p. 617; *People* v. *Hall*, 212 Cal.App.2d 480, 482 [28 Cal.Rptr. 164].) ■■ In addition, an assault with a dangerous weapon made in a manner to endanger life and resulting in death is sufficient to sustain a verdict of second degree murder. Malice is implied from the assault. (*People* v. *Watkins*, 178 Cal.App. 2d 41, 44 [2 Cal.Rptr. 707]; *People* v. *Torres*, 94 Cal.App.2d 146, 149-150 [210 P.2d 324].) ■■ Finally, it is apparent that appellant's conduct in forcing the girl from her home and into his car amounted to a kidnaping and that the killing occurred in the perpetration, or attempted perpetration, of this felony.

Appellant made no attempt to establish facts in mitigation, and does not now point to any evidence which could possibly warrant a determination that this killing occurred while he was in such heat of passion as would naturally be aroused in the mind of an ordinarily reasonable person in the same circumstances.[1] His sole defense centered around his contention that he was suffering from psychomotor epilepsy and that the actual killing occurred while he was in a fugue state resulting therefrom. Expert witnesses testified that if this were the

---

[1] The jury was instructed, however, on the included offense of manslaughter.

case, appellant would have been unconscious at the time of the killing and, hence, not responsible for his actions.

A court-appointed doctor testified that he had administered an electroencephalograph test to appellant which produced readings in his opinion indicating brain damage consistent with psychomotor epilepsy in a dormant stage. However, he also testified that many people have brain damage without having psychomotor epilepsy and that the markings shown on the electroencephalogram could have been caused by "nightmares"[2] although they were more consistent with psychomotor epilepsy. He further testified that a person would have no recollection of any events occurring while he was in the fugue or seizure state; that if a person did remember any such event, it would indicate that he was not experiencing a true attack. He, therefore, concluded that it would be most important to determine whether a person was responding truthfully when he reported a lapse of memory. This doctor did not converse with appellant personally.

A second court-appointed doctor testified that, based upon his original conversation with appellant and his reading of the preliminary transcript, he had suggested the electroencephalograph examination. He felt that appellant might have experienced an episode of psychomotor epilepsy because the killing seemed a "senseless" one and appellant had reported suffering a head injury at the age of 12 and syphilis at the age of 30. The results of the electroencephalogram examination tended to confirm this possibility. He further testified that in his opinion appellant "was probably telling the truth. I detected no evidence that this man was attempting to lie."

During his cross-examination, he conceded that he had not attempted to ascertain the truth of appellant's statements to him regarding his earlier sexual offenses that had resulted in his commitment as a sexual psychopath. He stated, however, that he did not feel that this was necessary because here he was concerned with the primary question of whether appellant had suffered an epileptic seizure, and, therefore, the truth or falsity of his statements regarding prior sexual conduct would not have altered his basic opinion. Appellant's wife and his sister testified that on several occasions he had struck them and thereafter had said he was sorry. His sister stated that when he struck her his eyes were "wild and strange" and "he was kind of foaming around the mouth a little bit, bubbles coming out of his mouth like foam."

---

[2]The test was made while appellant was in a "sleeping state."

In seeking a reversal, appellant assigns as error several actions of the prosecuting attorney which, he asserts, constituted prejudicial misconduct. ██ Initially, he contends that reversible error was committed when the prosecutor included the following language in his opening statement:

"Ladies and gentlemen, we will show that this defendant having been rejected and told this morning to stay away from this child, when he picked her up and said he was taking her with him, he touched her, ladies and gentlemen, and took this child whom he considered a woman to him, he touched her with a lewd and lascivious intent and that when she got away from him, he killed her rather than let her go. Based on this touching, ladies and gentlemen, with this lewd and lascivious intent, we will ask you when the case is over for a verdict of murder in the first degree in this case."

It is apparent from this statement that, in addition to suggesting the possibility that the murder was of the first degree because it was premeditated, the prosecuting attorney was contending that he would be able to prove also that it was murder of the first degree because it was committed in the perpetration of, or in the attempt to perpetrate, any act punishable under section 288 of the Penal Code. (Pen. Code, § 189.) It is not clear from this rather ambiguous statement whether he thought that the evidence would show that the touchings that actually occurred were such as to constitute a violation of section 288, or whether he felt that the touchings constituted the act which would constitute an attempt to violate section 288 when combined with the intent to consummate the violation itself elsewhere.

If he meant the first possibility, he was mistaken at the very least, for the evidence wholly failed to show that any touching which occurred in the course of appellant's seizure of the girl constituted the "lewd or lascivious act" required by section 288. (Cf. *People* v. *Webb*, 158 Cal.App.2d 537, 542 [323 P.2d 141].)

However, since the statement did not actually assert that the touchings themselves were lewd or lascivious, but only that they were done "with a lewd and lascivious intent," it may have been that the prosecutor intended to argue that from appellant's admitted prior sexual relations with the girl, and her complaint against him that morning, the jury could infer that appellant's seizure of the girl was done with the intent to commit a lewd and lascivious act thereafter, and, hence, constituted an attempt to violate section 288. We

need not decide or speculate on this latter possibility, however, for at the conclusion of the evidence the trial court agreed that the prosecution had failed to sustain its burden in this regard, and, in his opening argument, the prosecuting attorney withdrew from the jury any consideration of this possibility.

It is clear that the jury followed the prosecution's concession for it found appellant guilty of murder of the second degree. Appellant, nonetheless, contends that the very making of such an opening statement constitutes such prejudicial error as to require a reversal. We cannot agree with this contention. ■ The very case upon which appellant principally relies adequately sets forth the accepted rule in this regard: "It is well settled that the opening statement of the deputy district attorney will furnish ground for an assignment of prejudicial misconduct only in exceptional cases—some involve lack of good faith or a deliberate attempt to misstate the evidence [citations], and some disclose such flagrantly improper conduct as to work a legal prejudice to the defendant. [Citation.] ■ The purpose of the opening statement of the prosecuting attorney is to outline the state's evidence against the one accused of crime and to inform the jury what the People intend to prove. Generally the failure to make such proof during the trial does not indicate prejudice, particularly in the absence of showing of bad faith." (*People* v. *Carr*, 163 Cal.App.2d 568, 574-575 [329 P.2d 746].) In reversing the *Carr* case, the majority of the court stated (p. 578):

"The evidence at bar is not so strong in its support of the verdict that it does not appear reasonable to believe that the *misconduct* of the deputy district attorney contributed materially to the jury's determination of guilt. *This was a close case on facts.* The remarks of the prosecuting attorney in his opening statement, *coupled with his comment on the evidence in his closing argument, viewed in their entirety and cumulative effect in relation to the state of the evidence,* convince us that the *misconduct* of the deputy district attorney was so prejudicial as to result in depriving defendants of a fair trial." (Italics added.)

■ No such comments could possibly be made in the instant case. The evidence as to guilt of murder in the second degree, apart from the claim of nonresponsibility due to unconsciousness, is conclusive. The opening statement did not actually misstate any *facts* but merely postulated a theory

which the trial court later determined was not supported by sufficient evidence. No evidence was admitted in support of this theory that was not otherwise admissible. No showing has been made that this theory was suggested in bad faith. Finally, since the theory was withdrawn and the jury did not convict appellant of murder of the first degree as suggested by the proposed theory, the error, if any was not prejudicial.

Actually, appellant's underlying contention in this connection seems to be based upon his assumption that, absent the theory that the murder was committed during the perpetration or attempted perpetration of an act prohibited by section 288, the evidence relating to appellant's sexual relations with the deceased child would have been inadmissible. Thus he asserts that the ''testimony by the autopsy surgeon concerning the victim's sexual organs was irrelevant and was sought by the prosecution only to inflame the passions and prejudices of the jury against appellant.'' Further, that ''whether or not appellant admitted that he 'ever had sexual relations with the victim' was irrelevant; and, at the point in the trial where such evidence was introduced, the sole purpose of such testimony was to inflame the passions and prejudices of the jury against appellant.'' Manifestly, such conclusional contentions are not supported by the record.

The rule has long been established that where ''the motive of a crime is sought to be established before a jury, the whole conduct, life and character of the parties as affecting this question, is open to inquiry.'' (*People* v. *Le Doux*, 155 Cal. 535, 552 [102 P. 517].) The jury could have found that appellant's motive in abducting and killing the girl was to avoid further exposure of his previous relations with her.

Appellant did not deny the sexual misconduct with his victim which theretofore he had admitted to the investigating officers and such statement was certainly admissible not only to support the prosecution's theory that the murder was premeditated, but also to refute the premise of the expert witness that the killing was a ''senseless'' act. An act is not ''senseless'' merely because it does not make ''good sense.'' In addition, many acts that appear ''senseless'' when the motivations of the actor are unknown, become quite logical and consistent when such considerations are discovered.

Appellant also assigns as error what he denominates the ''irrelevant cross-examination questions put to two defense psychiatrists about appellant's past sexual history [which]

exceeded the scope of direct examination, assumed facts not then or ever properly introduced into evidence, and were asked solely to inflame the passions and prejudices of the jury against appellant.''

The general rules regarding expert testimony and the scope of cross-examination of experts have been frequently stated. ▮ ''A medical expert is entitled to express his opinion on a medical question presented in issue and then he may support that opinion by giving the reasons assigned in support of it. [Citation.] ▮ Expert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the facts and the validity of the reasons advanced for the conclusions. [Citation.] ▮ The weight to be given to the opinion of an expert depends on the reasons he assigns to support that opinion. [Citations.]'' (*People* v. *Martin,* 87 Cal.App.2d 581, 584 [197 P.2d 379].)

▮ ''Once an expert offers his opinion, however, he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, *the reasons for his opinion including facts and other matters upon which it is based* (Code Civ. Proc., § 1872), and which he took into consideration; and he may be *'subjected to the most rigid cross examination'* concerning his qualifications, and *his opinion and its sources* [citation].'' (Italics added.) (*Hope* v. *Arrowhead & Puritas Waters, Inc.,* 174 Cal.App.2d 222, 230 [344 P.2d 428].)

▮ The one expert witness who testified during the criminal phase of the trial regarding his opinion of appellant's mental condition at the moment of the killing stated that he felt appellant probably had experienced a psychomotor epileptic attack. As heretofore indicated, he gave, *inter alia,* the following reasons for this opinion: ''My own evaluation of this offense as a seemingly senseless act without the motivation that was apparent to me with the defendant claiming unconsciousness or unawareness of his behavior during this time that this little girl was stabbed.''

It should be noted that this expert's ultimate opinion regarding appellant's mental condition at the moment of the killing was not based directly upon ''*facts*'' but rather upon his own preliminary ''*opinions*'' concerning appellant. That is, the doctor's belief that appellant was telling him the truth when he denied any memory of the actual killing is

clearly an opinion or conclusion of the doctor's and not a fact. Likewise, the determination made by the doctor that the killing was a "senseless act without motivation" was only his opinion or conclusion and not a demonstrable fact.

The prosecuting attorney sought to overcome the effect of this expert's testimony by inquiring whether he would change the intermediate and supporting opinions upon which his ultimate opinion rested if certain additional facts were known to him. To this end, he inquired whether the doctor had made an independent investigation of the prior criminal sexual offenses that were related to him by appellant in an effort to determine (1) whether appellant's version thereof was truthful, and (2) whether a full knowledge of these offenses might not render the present act less "senseless." The doctor indicated that he had not made such an investigation.

The prosecuting attorney thereafter asked a number of questions relating primarily to a prior incident contained in the doctor's report which was based upon information supplied to him by appellant. Initially, the witness was asked: "Dr. McGinnis, this alleged offense, referring to your report on page 3, line 24, where it refers to a total of 19 months hospitalization in the years 1954 and 1955 he was a patient at the Metropolitan and Atascadero State Hospital as a sexual psychopath, he said, 'because I was accused of kidnapping a girl, age 12. She wasn't harmed. Her mother had her on the streets. Her name was Maria. She performed oral copulation. Her mother really sold her to me. I didn't mistreat her. I took her with me to San Francisco to see my uncle. Then I was arrested.' That is what the defendant told you that portion that I have just read?" The witness answered in the affirmative.

Thereafter, a number of questions were asked which, at least by implication, indicated that appellant's version of this incident was false insofar as it was designed to raise the inference that the girl's relations with appellant in that instance had been voluntary. All of these questions followed upon the overruling of appellant's objections that they were improper in that they assumed facts not in evidence, and that even if the assumed facts were true, they should not be presented before the jury, absent a showing that the witness would alter his expressed opinion on the basis thereof. In ruling upon these objections, the trial court indicated that it was relying upon the assertion of the prosecuting attorney

that he was prepared to prove any facts assumed or implied in his questions, and, further, that such facts could have been introduced by the prosecution in its case in chief for the purpose of proving motive.

We find no error in these proceedings. ██ "Just as the cross-examination of an ordinary witness may involve questions which test his memory, observation, and bias, so in cross-examining one who takes the stand as a skilled witness, his judgment upon germane matters may be tested by assuming premises and asking his conclusions. The modes and purposes are substantially the same as in testing ordinary witnesses. ..." (2 Wigmore, Evidence (3d ed.) § 684, p. 811, and cases cited in support thereof in footnote No. 1; also cf. *Reynolds* v. *Struble*, 128 Cal.App. 716, 732 [18 P.2d 690]; *Livingstone* v. *City of New Haven*, 125 Conn. 123 [3 A.2d 836, 838]; *Taylor* v. *Reo Motors, Inc.*, 275 F.2d 699, 702.)

██ Actually the cross-examination of an expert is, in this respect, most analogous to the situation presented when a witness who has testified to the good reputation of an accused is subjected to cross-examination regarding his knowledge of specific instances of conduct inconsistent with the character attributed to him by the witness. If these questions are asked in good faith they are proper, although they are, of necessity, based upon facts not in evidence. (*People* v. *Cooley*, 211 Cal.App.2d 173, 212-214 [27 Cal.Rptr. 543].)

As indicated, the prosecuting attorney stated that he was ready and able to prove any facts not in evidence that might be implied in his questions if the expert's answers indicated that his opinion would be altered by the presence of such facts. Ultimately the expert stated that his opinion would not be changed by any suggested additional facts so that the issue was thus terminated.

██ In connection with this basic assignment of error, appellant also contends that the trial judge committed prejudicial error when he terminated the line of inquiry above discussed by asking a hypothetical question of the witness, which, as he advised the jury and the witness, would be based upon exaggerated facts which he did not imply to be true and which he assumed were untrue. When the witness replied that even on the basis of these exaggerated conditions his opinion would not be changed, the trial court refused to permit any further questioning along these lines by the prosecution. Under the unique situation here presented, this was not prejudicial error.

■ Appellant, as part of his general charge of misconduct on the part of the prosecuting attorney, contends that the latter made "deliberate misstatements of fact during his summations about appellant's relationship with the victim and his unlimited use of the mother's hearsay testimony which had been allowed for a limited purpose constituted prejudicial misconduct which prevented appellant's receiving a fair trial." The record does not support this contention.

The prosecuting attorney properly referred to the mother's testimony that she had told appellant, on the morning of the killing, that her daughter had complained of his following her and that she therefore had told appellant to "stay away from her." He quite properly argued therefrom that the jury could infer that his purpose in kidnaping and killing the girl stemmed from the anticipated frustration of his sexual relations with the girl. All the statements were based upon the evidence presented to show appellant's state of mind on the day in question, and the motives suggested by the prosecution were reasonable inferences to be drawn therefrom. ■ In view of the fact that the jury rejected the prosecution's theory that they should find appellant guilty of murder of the first degree as the result of these suggested inferences, no prejudice resulted to appellant.

■ Another assignment of error is directed toward a portion of the prosecution's closing argument. The deputy district attorney was seeking to disparage the opinion of the expert who had testified concerning the possibility that the killing had occurred during a psychomotor epileptic seizure. The prosecutor noted that the question whether appellant had been truthful in his statements to the doctor regarding his lack of memory was of vital importance in deciding whether appellant actually was subject to such a condition and, secondly, whether this killing had occurred during an attack thereof. He then pointed to the fact that this doctor had indicated that records of appellant's past misconduct might prove helpful in such circumstances, but he had not considered it part of his duty as a court-appointed expert personally to investigate the records in such cases.

The argument then continued: "He [the medical expert] knew and he told you that he knew these sources of information. And when he wanted to show that this man was unconscious, this seeker of the truth, this man interested in justice, when he wanted to show this man was unconscious, when he wanted to verify the head injury, so he could say, 'you see, he does have a head injury so he must have psychomotor

epilepsy. At least, he probably had it.' For that, he bothers to ask the court, 'Please, have Dr. Mariacci ... perform a brain test!

''And yet, agreeing that he should validate and that it's ideally best to confirm and validate, he did not bother to find out if everything else the defendant had told him was true. He did not bother to pull the file about the incidents in the past. He did not go to those things to determine, 'Well, let me see what type of man I am dealing with before I get up on the stand and tell a jury that they should find that this man was unconscious and, therefore, free him of this charge so that possibly he may go out and kill again.' ''

At this point, appellant's counsel interposed an objection, which was overruled, contending that this statement was designed to inflame the jury. The deputy district attorney then continued: ''Here is a man, if he is suffering from psychomotor epilepsy, ladies and gentlemen, we let him go. If he doesn't remember, he was unconscious and he is not guilty of the crime. If he is unconscious who is to say when he is going to be unconscious again? What if he does have psychomotor epilepsy, if he was unconscious, well, ladies and gentlemen, if Dr. McGinnis convinces you of that, then, of course, you let him go.''

It is clear that the reference to the fact that appellant might ''go out and kill again'' was not directed to the jury. It was made abundantly clear that if they believed appellant was unconscious at the time of the killing, he was not guilty of the crime and they were not urged to find him guilty because of some fear concerning his future conduct. Rather, the prosecution was urging that, since the killing was admitted, the doctor should have given more attention to investigating appellant. Nevertheless, such references to future conduct, even when made by indirection, should be avoided. However, we find this error not sufficiently prejudicial to require reversal in the light of the entire record.

Appellant next assigns as error the exercise of the court's discretion in discontinuing the daily transcript during the arguments of counsel. A daily transcript was available throughout the presentation of evidence, and appellant has wholly failed to show how he was, or could have been, prejudiced by not receiving a transcript of the prosecution's brief opening argument.

Appellant also contends that error was committed when the court, on its own motion, failed to instruct ''that

evidence contained in certain questions put to the psychiatrist was admissible solely to test the basis for his opinion and not for the truth of the matters asserted in such questions." It is not entirely clear what "evidence" appellant has in mind in reference to this assignment. The court instructed the jury in the manner prescribed by section 1127b of the Penal Code which states that "No further instruction on the subject of opinion evidence need be given."

Recognizing that a reversal may not be urged by reason of the failure of the trial court to give special instructions which were not requested, appellant seeks to avoid the consequences of his failure to prepare any such special instruction by asserting that he was misled by the trial judge's promise to give such an instruction on his own motion. The record in this connection reveals that this alleged "promise" occurred during discussion between court and counsel regarding the propriety of the prosecution inquiring of the medical expert concerning statements made to him by appellant during his examination. The following appears in the record:

"THE COURT: I don't see how the defendant is damaged on it, because it could have been presented on the case in chief. MR. DENNY [Appellant's counsel]: He is damaged because it could have been presented on the case in chief. THE COURT: Because I am going to instruct the jury to consider that this goes only to the basis of the forming of the witness's opinion. MR. CABALLERO [Deputy district attorney]: Yes, that is what it is offered for, as to the basis of the forming of the opinion. THE COURT: I don't see how he would be damaged with that instruction. MR. DENNY: The Court well knows your instruction to the jury is not going to have a whit of effect on them as to why this evidence is admitted. MR. CABALLERO: The Supreme Court doesn't feel that way. MR. DENNY: The Supreme Court in its dissents realizes that and every court and every practicing lawyer knows that when a Judge instructs a jury to disregard evidence or tell the jury that it is admitted for some special purpose, the jury gets it and all of the other instructions that the Court gives."

Rather than indicating that appellant was misled by the court as to the necessity of preparing a special instruction if so desired, the opposite would appear to be true. Under these circumstances appellant may not complain of error for the first time on appeal.

Appellant next assigns as error the failure of the trial court to give two special instructions requested by him. The first provided "If a person is moved from one part of the County to another, but you find that such movement or asportation is only incidental to an assault with a deadly weapon which causes the death of the person moved, such movement will not constitute kidnaping within the meaning of the laws." The court adequately instructed the jury on the crime of kidnaping in the manner set forth in CALJIC Nos. 651 and 652. The instruction requested by appellant had no possible support in the record under any imaginable interpretation of the evidence and was properly refused. Comparison of the present factual situation with that presented in *Cotton* v. *Superior Court*, 56 Cal.2d 459 [15 Cal.Rptr. 65, 364 P.2d 241], from which appellant's proposed instruction is derived, provides a sufficient answer to this assignment of error.

Appellant's second instruction stated: "When an act of killing occurs during the perpetration or attempt to perpetrate a felony, the person accused of the killing is not guilty of murder under the felony-murder rule, as already explained to you, if he was unconscious at the time he did the act producing the mortal injury. This is so even though the accused person may have been conscious during the perpetration or attempt to perpetrate the other original felony."

The basis for requesting this instruction is appellant's contention that since he admittedly remembered the incidents surrounding the kidnaping up to the killing itself, the jury might find him guilty under the instructions given, even if they believed that he was unconscious at the time of the actual killing. We cannot agree. The instructions given adequately cover the subject and are not subject to any such misinterpretation as suggested. They were in the form suggested by CALJIC Nos. 71C and 71D, which provide in pertinent part:

"Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime"; and "If you should find that the defendant committed an act, which, if he was conscious, would have constituted the crime charged against him or would have been an element of that crime, and, if you have a reasonable doubt whether the defendant was conscious at the time of such act, you should find that he was unconscious."

Appellant was charged with the crime of murder, not kidnapping, and no confusion could have arisen as to the act to which the defense of unconsciousness applied. It might, indeed, be noted that it is appellant's requested instruction that is inherently inconsistent and self-contradictory, for it suggests a person could be both conscious and unconscious at the same moment; that is, in the instant case "the act producing the mortal injury" occurred "during the perpetration, or attempt to perpetrate the other original felony." The refusal of this instruction was not error.

 Appellant's final assignment of error relates to procedure adopted by the trial court during the insanity phase of the trial. The evidence was sharply conflicting therein. One expert adopted the theory of psychomotor epilepsy asserted during the criminal aspect of the trial; another rejected it. None of the experts felt appellant was insane except in the particular that he might have committed the murder during such an epileptic attack. In view of the fact that appellant admittedly remembered all events preceding his actual wielding of the knife, that immediately thereafter he was sufficiently aware of the nature of the situation to threaten one of the witnesses who attempted to intervene and thereafter disposed of the murder weapon, changed his clothing and undertook an extended flight through several states under an assumed name, the jury's determination of his sanity cannot be disturbed on this appeal.

 The only error assigned in regard to the insanity phase of the proceeding is that the trial court permitted the prosecution both to open the trial and to make the closing argument. He would have us overrule *People* v. *Letourneau*, 34 Cal.2d 478 [211 P.2d 865], *People* v. *Kimball*, 5 Cal.2d 608 [55 P.2d 483], *People* v. *Goold*, 215 Cal. 763 [12 P.2d 958], and *People* v. *Hickman*, 204 Cal. 470 [268 P. 909], which have heretofore approved of this procedure. Such is not within our power. If any change is required in this particular, it must come from the Supreme Court. We cannot say that the trial judge abused his discretion in determining to follow such a long-established procedure.

The judgment is affirmed. The attempted appeal from the order denying appellant's motion for a new trial is dismissed.

Fox, P. J., and Roth, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 13, 1964.