## UNITED STATES v. MONROE.

### No. 55, Docket 20723.

Circuit Court of Appeals, Second Circuit.

Nov. 14, 1947.

Writ of Certiorari Denied Feb. 2, 1948.
See 68 S.Ct. 452.

472

John F. X. McGohey, of New York City (Thomas F. Murphy, of New York City, of counsel), for the United States.

Judd & Gurfein, of New York City (Murray I. Gurfein, Orrin G. Judd, and Saul A. Shames, all of New York City, of counsel), for appellant.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

Appellant appeals from a conviction on 29 counts of an indictment of 30 counts for conspiring to sell and selling finished piece-goods at prices in excess of those permitted by the maximum price regulations.[1] Other defendants named in the indictment were the Verney Mills, Inc., Verney Fabrics, Inc., Harrison A. Biggi, vice-president of the Verney Fabrics Corporation, and Gilbert Verney, president of the Verney Fabrics Corporation. Named as a co-conspirator in the indictment but not as a defendant was Abner Berman. During the trial the indictment was dismissed as to Gilbert Verney, and the 12th count was dismissed as to all defendants. The jury found the appellant guilty on all remaining counts, and found all the other defendants not guilty on all counts.

There is little dispute regarding the facts of the transactions out of which the charges grew, although the interpretations to be placed on these facts give rise to several problems. Monroe was a Washington consultant for the textile industry. Two of the

---

[1] 18 U.S.C.A. § 88; 50 U.S.C.A.Appendix, § 901 et seq.

corporations which made use of his Washington services were Verney Fabrics, Inc., and Verney Mills, Inc., and he was friendly with their president, Gilbert Verney, and the vice-president, Harrison Biggi. Sometime in February 1945, when it was exceedingly difficult for manufacturers to obtain finished piece-goods because of the war, Monroe was introduced to Ben Schrift, manager of the Modern Industrial Bank. Monroe told Schrift that he could assist manufacturers who were then having difficulty procuring goods. Subsequently at the bank Schrift introduced Monroe to Abner Berman, a depositor in the bank, and a free-lance piece-goods salesman. Monroe suggested to Berman that he approach some of his customers who might want to buy some textiles at over-ceiling prices and whose credit could be checked. Berman left the bank and approached one of his customers, Sol Wood, president of Debutante Frocks, and returned to Monroe with the information that Wood would take 20,000 yards. Monroe then left the bank and returned shortly with a contract from Verney Fabrics Corporation for Debutante Frocks for 20,000 yards, and informed Berman that it would cost his customer 30 cents a yard over the ceiling-price, which was set in the contract as the price to be paid. Berman protested that the figure was higher than his customer would pay, and Monroe said that he would cancel the contract. The next day Wood received a cancellation of the contract, although he had never in fact received a contract. Disturbed, he contacted the Verney officers and Berman; subsequently he and Monroe and Berman had a stormy meeting at the bank, where they finally reached a compromise figure of 15 cents per yard over the ceiling-price.

Monroe asked Berman to get him more customers, and Berman approached Joseph Leventhal, President of J. Leventhal, Inc., a dress-manufacturing concern. Berman having reported to Monroe that Leventhal would use 20,000 yards, Monroe returned shortly with a contract from Verney Fabrics Corporation for the 20,000. As Leventhal wanted to hold the contract for a few days before paying the 30 cents per yard above ceiling-price stipulated by Monroe Berman paid Monroe $6,000 of his own money for the contract which Monroe then delivered to Leventhal, subsequently receiving back $7,000 from Leventhal. Subsequently, Monroe met Leventhal, who asked him to perform services for Leventhal in Washington; and Monroe later dealt directly with Leventhal in matters of sales of piece goods of the Verney Fabrics Corporation to J. Leventhal, Inc., or a subsidiary, Joanley Sportswear, Leventhal paying a total of $23,370 to Monroe by cash or check for 67,500 yards of piece-goods. Monroe had five bills typed out for Leventhal showing the receipt of $21,500 for "advisory and consulting services."

Monroe, through Berman, had dealings, all following the same general pattern, with a number of other dress manufacturers. Berman would meet Monroe, who would tell him to get in touch with his customers. Berman would then get in touch with the customers, and report their names and the amount of yardage they desired to Monroe, either at the Modern Industrial Bank or, later in the series of transactions, at the Hotel Biltmore. Monroe would then get in touch with one of the secretaries of the Verney Fabrics Corporation, and would have a check made of the credit of the prospective purchaser. At times the credit-rating was not satisfactory, but when it was, a contract was prepared by the Verney Corporation and delivered to Monroe. Monroe then turned the contract over to Berman, who delivered it to the purchaser and returned to Monroe with cash. In all these transactions, Monroe received 30 cents above the ceiling-price, a figure established in the contract as the sales-price. Berman also added from 5 to 12 cents to the price, which he kept for himself. Payment of the ceiling-price was made by the purchaser to a factor, who made payment to the Verney Corporations. The transactions in the indictment cover the months of March, April and May, 1945. During this period, Monroe received about $164,000 from these transactions while Berman received about $22,000.

1. Monroe contends that the district judge's instructions with regard to Berman were so prejudicial as to require reversal of the conviction on the conspiracy counts. The portion of the instructions which Monroe challenges is as follows: "Berman was

an accomplice. Berman is the gentleman who was named as a conspirator but not indicted as a defendant. He was an accomplice. The indictment charges him as a co-conspirator, and his evidence establishes it conclusively. So are the others who made purchases over ceiling prices, if you are satisfied that the purchases were actually in violation of the maximum-price regulation under the circumstances under which they were made, because the Regulation also makes it illegal to purchase at over-ceiling prices. The testimony of accomplices should be subjected to very careful scrutiny because of their participation in the offense charged and because of the possible interest that they may have in the case."

Monroe argues that the proved conspiracy could have consisted only of himself and Berman, since all other defendants were acquitted and there was no evidence to indicate a conspiracy with "persons to the grand jury unknown." It is contended, therefore, that the sentence to the effect that the evidence conclusively showed Berman to be a co-conspirator took from the jury consideration of a factor necessary for their determination that there was a conspiracy, for a conspiracy requires at least two people, and Berman must have been one of but two in this instance.

 Since no exception was taken to the instructions, we will not consider the alleged error unless substantial prejudice has resulted. Federal Rules of Criminal Procedure, Rules 30, 52 (a) and (b) 18 U.S.C.A. following section 687; Palmer v. Hoffman, 318 U.S. 109, 119, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719; Johnson v. United States, 318 U.S. 189, 200, 63 S.Ct. 549, 87 L.Ed. 704; United States v. Levy, 3 Cir., 153 F.2d 995; Yoffe v. United States, 1 Cir., 153 F.2d 570. Although the particular sentence may have been misleading, we think the instructions as a whole show no such prejudice. Several times the judge warned the jury that they must consider each defendant separately. The objectionable sentence is but a part of a paragraph in which the court advised the jury, in protection of Monroe's rights, that Berman's testimony, as an accomplice, must be viewed with skepticism. Had counsel who tried the

case brought the purported error to the attention of the judge at the time, he would surely have corrected any lack of clarity. Assuming, arguendo, that there was error, we do not think it was plain error of the sort which this court, under Rule 52(b), will consider, when no exceptions were taken below.

2. Monroe also urges that the conspiracy, of which he stands convicted, substantially and prejudicially differs from that charged in the indictment. His reasoning runs as follows: He was charged with conspiring with the Verney people as well as with Berman; since the Verney people were acquitted, the only conspiracy of which he could have been convicted was with the unindicted Berman; a conspiracy with Berman would be substantially different from the conspiracy charged in the indictment; therefore there is a fatal variance between indictment and proof.

We think the argument without merit. The first count of the indictment reads that: "'John Porter Monroe,' Harrison A. Biggi, Gilbert Verney, Verney Mills, Inc., and Verney Fabrics Corporation, the defendants herein, and Abner Berman, not named as a defendant herein but as a co-conspirator, unlawfully, willfully and knowingly did agree together and with each other and with diverse other persons whose names are to the Grand Jurors unknown, to commit offenses against the United States. * * * It was a part of said conspiracy that the defendants and co-conspirators would arrange for the making of written contracts for the sale of finished piece-goods between the Verney Fabrics Corporation and purchasers in conformity with the prices issued by the Price Administrator.'"

 The acquittal of some defendants on a conspiracy charge does not vitiate the conviction of others where it is shown that a criminal conspiracy did in fact exist. Joyce v. United States, 8 Cir., 153 F.2d 364 certiorari denied 328 U.S. 860, 66 S.Ct. 1349, 90 L.Ed. 1631. In the case at bar, if the jury could find, as we think from the evidence they could, that a conspiracy existed between Berman and Monroe to violate ceiling-prices—a conspiracy involving the arrangement of contracts between Verney

Fabrics, Inc., and the purchasers, by the efforts of Monroe—there would be no variance between the indictment and the proof. But even supposing a variance to have existed, it was not of such a nature as would cause us to reverse. "The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused. The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense." Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314. See also Kotteakos v. United States, 328 U.S. 750, 756, 757, 66 S.Ct. 1239, 90 L.Ed. 1557; United States v. Manton, 2 Cir., 107 F.2d 834, 849. There is no indication here that appellant is in danger of double jeopardy. Neither does it appear that appellant was in any way surprised. The evidence presented by the government of the transactions which constituted the conspiracy (which transactions, incidentally, were fully set out in the substantive counts of the indictment) was the same whether the conspiracy included the Verney people or merely Berman. Nor was there any danger of "transference of guilt from one to another across the line separating conspiracies" (see the Kotteakos case, supra, 328 U.S. at page 774, 66 S.Ct. at page 1252, 90 L.Ed. 1557), since here the Verney officers were acquitted.

3. Monroe further argues that the court told the jury that he could be convicted as a seller's agent where the sum of his fees from buyers (not shared with the seller), added to the ceiling-price, exceeded the ceiling-price, and that nothing in the statute, 50 U.S.C.A., Appendix, § 901, et seq. or Maximum Price Regulation No. 127, could justify such an instruction. The argument rests on two propositions: First, that under the statute and regulation appellant could not be convicted as a seller's agent; second, that the court charged that he could have been so convicted.

We agree that the judge's language was broad enough to include the concept of a seller's agent. The judge said: "You must be satisfied from the evidence, in order to warrant a conviction, that there was a connection between these corporations and Monroe, and that that connection was something more than courtesy, that it was a commitment which placed goods for sale under his control. You must be satisfied from the evidence that his efforts in effecting the sales were made in behalf of the corporations, that is, the sellers, and not in behalf of the purchasers. * * * But if you are satisfied from the evidence that these transactions were effected by Monroe in this manner merely as a means or method adopted for the purpose of selling piece-goods belong to or entrusted to these corporate defendants for sale, and if you are satisfied from the evidence that Monroe's efforts, in spite of their form, were in reality performed as a service for the sellers under commitments to Monroe which placed the goods under his control for sale, in that case the fees charged by Monroe should be deemed and considered part of the selling price, and under these conditions, if the selling price, including the fees charged by Monroe were in excess of the ceiling-price, violations of the substantive counts would be established." The reference to "efforts in effecting the sales * * * in behalf of the corporations, that is, the sellers," would in particular seem to constitute a charge of agency. We believe, however, that the charge was proper under the statute and Regulation, and that nothing in the case of United States v. Weiss, 2 Cir., 150 F.2d 17, certiorari denied 326 U.S. 736, 66 S.Ct. 45, 90 L.Ed. 438, should be construed to prohibit such a charge.

The Emergency Price Control Act, 50 U.S.C.A., App. § 904(a) provides: "It shall be unlawful, regardless of any contract, agreement, lease, or other obligation heretofore or hereafter entered into, for any person to sell or deliver any commodity * * * or otherwise to do or omit to do any act, in violation of any regulation * * * or to offer, solicit, attempt, or agree to do any of the foregoing." Section 2(g) of the same Act, 50 U.S.C.A., App. § 902(g), authorizes the Administrator to incorporate provisions

in the regulations which are "necessary to prevent the circumvention or evasion thereof." The evasion section of Maximum Price Regulation No. 127, dealing with finished piece-goods, provides as follows: "Evasion. The price limitations set forth in this Maximum Price Regulation No. 127 shall not be evaded, whether by direct or indirect methods, in connection with an offer, solicitation, agreement, sale, delivery, purchase or receipt of or relating to finished piece-goods, alone or in conjunction with any other commodity or by way of commission, service, transportation, or other charge, or discount, premium or other privilege, or tying agreement, or other trade understanding, or otherwise." Whether semantically Monroe is characterized as a seller's agent or something else, we think the charge, under the language of the statute and Regulation, was justified. The most charitable interpretation which could be placed on his actions was that he accepted a commission in connection with the sale, and that conduct, under the plain language of the section, is an evasion. We agree with appellant that, according to M. Kraus & Bros. v. United States, 327 U.S. 614, 626, 66 S.Ct. 705, 90 L.Ed. 894, omissions from the Regulations cannot be supplied by the use of policy judgments; but where, as here, there was no omission, that case cannot apply. Neither do we understand United States v. Weiss, supra, to call for a different result here. There Weiss was indicted and convicted as a seller. Although the district court charged that he could not be convicted as an agent, the charge as to a seller was in broad terms. This court said, supra at page 19 of 150 F.2d: "So far as concerned the 'finder,' this charge was perhaps more favorable than Weiss was entitled to; so far as concerned the sales, it was plainly right." It added: "Particularly in the case of a statute so vital to the welfare of the nation * * * we are to have in mind its purpose and construe in accordingly."

■ 4. Monroe also argues the absence of proof that he was a seller, since the Verney Corporations at all times retained absolute dominion and control of the finished piece-goods. In United States v. Weiss, supra, 150 F.2d at page 19, this court

said: "If the promisor in fact has command over the goods at the time of performance, so that he can procure the transfer of title from the owner to the buyer, it is of no importance that it [title] does not pass through him." There is ample evidence in the record from which the jury might have found that Monroe had sufficient command over the piece-goods to procure their transfer at the time of performance.

■ 5. Monroe asserts a lack of proof of the maximum ceiling-price permitted to him, as distinguished from the Verney Corporation. During the trial, a stipulation was introduced in evidence, "authorized by all counsel," stating that "the maximum price per yard, pursuant to the Maximum Price Regulation No. 127 and the amendments thereto, for the finished piece-goods set forth in each of the contracts heretofore marked in evidence as Government exhibits is the price per yard set forth in the said contracts by Verney Fabrics Corporation." We think the stipulation disposes of appellant's contention. Cf. United States v. Hefler, 2 Cir., 159 F.2d 831, 833, certiorari denied 331 U.S. 811, 67 S.Ct. 1202.

6. Monroe, who legally changed his name from Monroe Kaplan in 1940, was indicted under the name of "Monroe Kaplan, alias 'John Porter Monroe.'" By the agreement of all parties and the court, no mention was made of the name Kaplan throughout the trial. The jury, after having been out for some time, requested a copy of the indictment. When Monroe's counsel objected, the government offered physically to excise the offending matter from the indictment, which offer Monroe's counsel rejected. The judge then called in the jury, gave them the indictment, and explained to them that no connotation of criminality could attach to the term, "alias," and that appellant had in fact legally changed his name. Appellant renewed his objection to giving the indictment to the jury, but did not object to the additional instructions as given. He now maintains that to give the indictment to the jury was highly prejudicial.

■ We agree that the practice of loading indictments with unnecessary aliases is inherently prejudicial; cf. D'Al-

lessandro v. United States, 3 Cir., 90 F.2d 640, 641. But the district judge's instruction was sufficient to cure whatever prejudice may have existed. Monroe now suggests that the instruction would have overcome the prejudice only if it had affirmatively stated that he had no prior criminal record. While such an instruction might have been desirable, the objection is the sort which trial counsel ought to have made at the time the instruction was given, and for the judge's failure to give it we will not now reverse. Federal Rules of Criminal Procedure, Rule 30; Yoffe v. United States, 1 Cir., 153 F.2d 570, 576.

Affirmed.