No. 23131.

LESTER S. ROSS, AS ADMINISTRATOR OF THE ESTATE OF CHESTER M. MASON, DECEASED *v.* THE COLORADO NATIONAL BANK OF DENVER.
(463 P.2d 882)

Decided December 22, 1969. Rehearing denied February 9, 1970.

438

Cogswell & Wills, Bill Earl Tom, Winner, Berge, Martin & Camfield, Fred Winner, for plaintiff in error.

Hodges, Silverstein & Harrington, Joseph G. Hodges, Thomas J. Kerwin, Randall Weeks, Murray, Baker & Wendelken, for defendant in error.

*En Banc.*

Mr. Justice Hodges delivered the opinion of the Court.

The defendant in error, the bank, filed a claim on a promissory note in the Estate of Chester M. Mason, deceased. The promissory note was held as pledged col-

lateral security by the bank for its loan to Colorado Central Mortgage Corporation, referred to as the mortgage company herein. Judgment was entered for the bank after a jury verdict in its favor and from this judgment the estate prosecutes this writ of error.

 With one exception, the various assignments of error advanced for our consideration by the estate do not warrant reversal. The one exception relates to the estate's claim of error that improper questions were asked of the estate's handwriting expert during cross-examination and that this prejudiced the estate's case. This claim of error is sustained and we therefore reverse the judgment and remand this cause to the trial court for a new trial.

The decisive fact issue to the jury was on the genuineness of Mason's signature on this promissory note, which was allegedly executed in connection with a transaction involving construction financing furnished by the mortgage company to Pan-Ark Lodges, Inc., of which Mason was president.

On May 21, 1964, a loan agreement was executed whereby the mortgage company agreed to loan $250,000 to Pan-Ark Lodges for the construction of a condominium lodge near Leadville, Colorado. Later, the amount of the loan was increased to $340,000 and a new loan agreement for that amount, bearing the same date, was executed. The president of the mortgage company testified that Mason's personal note payable to the mortgage company was required so that Mason would be personally responsible for the obligations of Pan-Ark Lodges under its loan agreement and corporate note. The reason behind the accommodation note was that Pan-Ark Lodges at the time of the loan had few assets but Mr. Mason was earning $100,000 a year and had a net worth in excess of $1,000,000. No witness testified about seeing Mason sign the note.

Thereafter, the mortgage company borrowed from the bank the funds required by it to make its advances to Pan-Ark Lodges. To secure that loan, the mortgage com-

pany endorsed to the bank (1) the corporate promissory note of Pan-Ark Lodges with the securing deed of trust, and (2) this accommodation note allegedly signed by Mason.

· Mason was killed in an airplane crash on November 22, 1964. The bank's claim on Mason's promissory note was timely filed in the estate on April 20, 1965. Although the Mason note was for the face amount of $340,000, the bank sought recovery only for the amount of advances made by it to the mortgage company, namely, $266,459.72, together with interest and attorney fees as provided in the note.

During the pendency of this action in the trial court, proceedings were commenced to foreclose on the deed of trust which secured the corporate note. The decree of foreclosure in Lake County was entered on February 27, 1967. The bank's claim on Mason's promissory note was filed in the trial court on April 20, 1965 and the jury trial commenced thereon on April 25, 1967. This record does not reveal whether or not a foreclosure sale has been conducted or the status of such foreclosure sale proceedings. We must assume a lack of finality in this regard because otherwise the amount realized from the foreclosure sale would have had to have been considered by the trial court in its judgment in favor of the bank.

I.

The estate contends that the bank under the case of *Estate of Blanpied*, 155 Colo. 133, 393 P.2d 355, was limited to one of three courses of action, none of which it followed here, and it was thus precluded from suing on the accommodation note. In *Blanpied,* we held:

"In our view, C.R.S. '53, 152-12-1, et seq. [which is presently C.R.S. 1963, 153-12-1, et seq., as amended] provides that the holder of an *encumbrance upon property of the deceased* may follow one of three routes: (1) he may ignore the estate entirely and look only to his security, (2) he may file a conditional claim so that he may share in any of the assets in the event there is a deficiency, or

(3) he may ignore the security and look only to the assets of the estate." (Italics ours)

The estate asserts that the bank, by seeking a foreclosure without first securing court permission, elected to proceed under (1) above and is therefore precluded from recovery on this claim against the estate on the Mason note.

We do not agree. The *Blanpied* case specifically speaks of an *encumbrance upon property of the deceased.* The property encumbered here was property of Pan-Ark Lodges, not of the deceased.

In addition, C.R.S. 1963, 153-12-14, in pertinent part provides:

"No deficiency claim or judgment shall be made or allowed against the estate of any . . . decedent where sale in foreclosure of the . . . deed of trust . . . securing such indebtedness shall have been had and made, either by sale by the public trustee or in foreclosure by suit, where the foreclosure sale shall have been made subsequent . . . to the death of the decedent, unless prior to such foreclosure sale the claim upon the indebtedness secured by the deed of trust, mortgage or other instrument shall have been filed in such estate on or before the expiration of the period within which the creditors may file claims of the fifth class, and unless prior to such foreclosure sale, either such claim shall have been allowed in such estate or permission to sell in such foreclosure shall have been granted by the court in which such estate is being administered."

The instant claim was filed on April 20, 1965, well within the time allowed; and the foreclosure decree was entered February 27, 1967. It is clear the claim was filed in the estate before any foreclosure decree. Furthermore, there is no indication there was a foreclosure sale anytime before the May 11, 1967 judgment was entered on the accommodation note.

This cause is very much akin to *Offill v. Routh,* 79 Colo. 150, 244 P.305. In that case, Offill gave a note

secured by a real estate mortgage. Before Offill died, he sold the land to one Dunlap who assumed the debt. After Offill's death, the holder bank foreclosed without having obtained permission to do so from the probate court. The note and mortgage was then filed as a claim against the estate and after the claim was filed, a foreclosure sale was had with a resulting deficiency. A deficiency judgment was then entered against Dunlap, the purchaser, which was returned unsatisfied. The court then allowed the claim against the estate for the amount of the deficiency.

In affirming the allowance of the claim in *Offill*, we stated:

"The statutes concerning the foreclosures of mortgages against estates are not applicable. This foreclosure was against Dunlap only. Offill had parted with the land, and the estate had no interest in it.

"The basis of plaintiff's claim against the estate was decedent's note, not the deficiency judgment. These are of necessity for the same amount because there can be no double recovery.

"The suit and judgment of foreclosure being against Dunlap an allowance of anything against the estate was not a prerequisite. The record presents no equities in favor of the estate and contains no hint that it has been prejudiced."

In this case, the foreclosure was against Pan-Ark Lodges, Inc. which owned the property. The estate never had any interest in the property. The basis of the bank's claim against the estate was the accommodation note. Of course, recovery against the estate would be reduced by the amount received by the bank from the foreclosure sale. In no event would the trial court permit any double recovery by the bank.

## II.

The estate also complains that it was erroneous for the court to give its Instruction No. 5 on burden of proof, because as given, it may have confused the jury. Essen-

tially, this instruction states the proper rule on burden of proof under the issues of this case. However, because the term "execution," as used in relation to legal documents, is not defined, this instruction may have confused the jury.

In any event, it is noted that the transcript reveals the only objection made in connection with the giving of instructions was the estate's objection that the court should have given its tendered Instruction No. 1. It did not at trial object to Instruction No. 5.

R.C.P. Colo. 51 provides that parties must make objections to any proposed instructions before they are submitted to the jury and that only the grounds so specified shall be considered on writ of error. The rationale behind Rule 51, often referred to as the contemporaneous objection rule, was explained by this court in *Scheer v. Cromwell*, 158 Colo. 427, 429, 407 P.2d 344:

"The 'contemporaneous objection' rule has a salutary purpose in the orderly administration of justice. Its principle is to enable trial judges to clarify or correct misleading or erroneous instructions before they are given to a jury, and thereby prevent costly retrials necessitated by obvious and prejudicial error. *McDonald v. Jarka Corp.*, 144 F.2d 53 (2nd Cir. 1944); *U.S. v. Monroe*, 164 F.2d 471 (2nd Cir. 1947). The United States Supreme Court has acknowledged the value of the 'contemporaneous objection' rule by recognizing it as an adequate state ground which prevents review of a constitutional question by that Court. Counsel has the duty to examine the instructions, and his failure to detect errors and call the trial court's attention to them ordinarily operates as a waiver of the objection. *Gilligan v. Blakesley*, 93 Colo. 370, 26 P.2d 808."

The estate's contention with regard to Instruction No. 5 is not well taken in view of its failure to object to the instruction at the time of trial.

## III.

The estate also argues that the court erred in its re-

444

fusal to admit in evidence its tendered Exhibit 15. Exhibit 15 was allegedly an enlarged reproduction of the questioned signature.

Colorado law requires a proper foundation for admission of photographs into evidence by showing them to be fair, accurate and truthful representations. *In re Estate of Hayes,* 55 Colo. 340, 135 P.449. The sufficiency of the preliminary proof to establish the same is a matter largely within the discretion of the trial court. *Potts v. People,* 114 Colo. 253, 158 P.2d 739; *Wold v. City of Boulder,* 91 Colo. 44, 9 P.2d 931; *In re Estate of Hayes, supra.* The trial court's action and decision will be reversed only in case of clear abuse of its discretion. *Wold v. City of Boulder, supra.* We can see no clear abuse of discretion by the trial court in excluding Exhibit 15. Furthermore, there were other photographs of the questioned signature in evidence, and therefore, the estate was not substantially prejudiced by the exclusion of this exhibit.

IV.

The estate urges that in several instances the bank's cross-examination of the estate's handwriting expert was so improper and so prejudicial as to constitute reversible error. From our review of all this cross-examination testimony, we agree that counsel for the bank was permitted by the court on several occasions to pursue, over objection, a course of cross-examination which was improper. The court committed error in not sustaining the objections to the improper questions.

As stated previously, the critical factual dispute for jury determination concerned the genuineness of the signature of Chester M. Mason on the promissory note. The evidence on this question came from three handwriting experts — two for the bank and one for the estate. The bank's experts testified that in their opinion the signature was genuine. The estate's witness stated that in her opinion the signature was a forgery. The estate's expert witness testified that she received her

training in document and handwriting examination through studies in graphoanalysis. This, according to her testimony, is a refinement of and is more exacting and scientific than graphology, which is a forerunner of graphoanalysis.

In several instances, the cross-examiner quoted from publications and letters emanating from the organization from which the witness received her training, and asked if the witness agreed with the statements. As to several of these items, the witness stated that she had never seen them previously. She testified that she had been certified as a graphoanalyst by this organization of which she is a member and from which she receives materials periodically on the subject of graphoanalysis. Some of the cross-examiner's questions which quoted from several of these items were for the obvious purpose of showing that graphoanalysis and its predecessor graphology had to do more with personality analysis based on handwriting than with the technical aspects of determining whether or not a signature was genuine.

As we view all the testimony of this witness, the most serious objection to all the questions during this extensive cross-examination centers about the series of questions based upon a book by Mr. Osborne and his son. The witness stated that she had not read it nor was she "familiar with that book." Nevertheless, over objection, the cross-examiner was permitted by the court to ask a series of questions about whether she agreed with several hearsay quotations from the book. The quotations dealt with a criticism of graphology. More specifically, the quoted hearsay statements of opinion by the authors were to the effect that many people who are interested in graphology are those who follow the "fortune telling phase" of it; that because of the unproven phases of graphology, it is dangerous for a document examiner to depend upon it; that when two handwriting experts disagree, it is reasonable to infer that at least one of them is either incompetent or corrupt; and that most disagree-

ments of experts can be thus explained because the fact is that corrupt expert witnesses are among the tools with which certain lawyers practice law.

In substance, the witness answered with respect to all of the above questions that she at least agreed with some of the quoted statements in part insofar as they may have applied to graphology but stated that the quotations dealt with graphology and not graphoanalysis; that honest experts certainly sometimes do disagree; and "that there are such things as incompetent and corrupt witnesses."

Considering the total impact of the improper hearsay questions, the conclusion is quite apparent that the innuendos and critical charges contained in the quotations from this text may have materially prejudiced the estate's case.

When the cross-examiner asked questions containing quotations from letters and booklets the witness had never seen, and also, when he asked questions and quoted from a treatise on document examination which the expert witness testified she had not read and therefore, had not used to support her expert opinion, the objections thereto should have been sustained by the court under the authority of *Wall v. Weaver,* 145 Colo. 337, 358 P.2d 1009; *Baker v. People,* 72 Colo. 68, 209 P.791; *Denver City Tramway Co. v. Gawley,* 23 Colo. App. 332, 129 P. 258.

It is fundamental that once a witness testifies as an expert, he subjects himself to the most rigid kind of cross-examination, including searching questions concerning his qualifications, the extent of his knowledge, and the basis of his opinion. *Hope v. Arrowhead Puritas Water,* 174 Cal. App.2d 222, 344 P.2d 428.

Rigid and searching cross-examination, however, does not license the cross-examiner to reach into the realm of improper hearsay questions which tend to demean an expert witness and his school of training by implications of incompetence and corruption. The impact of the improper questioning could have substantially prejudiced the estate's case. The trial court committed

reversible error in permitting counsel for the bank, over the objection of the estate's counsel, to ask these improper questions.

Judgment reversed and cause remanded for a new trial.

MR. CHIEF JUSTICE McWILLIAMS and MR. JUSTICE KELLEY dissenting.

MR. JUSTICE PRINGLE not participating.

MR. JUSTICE McWILLIAMS dissenting:

I respectfully dissent, as in my view the error, if any, in the cross-examination of one Ruby Steffen, a seventy-five-year old graphoanalyst called as an expert witness by the estate, does not constitute prejudicial error. Actually the particular cross-examination which according to the majority was both erroneous and prejudicial consists of only three or four questions in a record consisting of over 2,000 folios. As concerns the particular cross-examining questions deemed by the majority to be improper, the witness agreed with the content of several of the questions thus propounded. As concerns one of the other questions believed to be objectionable by the majority, counsel for the estate even stipulated that the question propounded was a "correct statement." Under such circumstances I for one am disinclined to make a mountain out of what I sincerely believe to be a molehill. I would affirm the judgment of the trial court.

I am authorized to state that Mr. Justice Kelley concurs in the foregoing dissent.