**VIKELL INVESTORS PACIFIC, INC.,
a New York Corporation,
Plaintiff–Appellant,**

v.

**KIP HAMPDEN, LTD., a Colorado Limited Partnership, Lincoln DeVore, Inc., and George Morris, Defendants–Appellants.**

No. 96CA0636.

Colorado Court of Appeals,
Div. II.

Sept. 18, 1997.

Sparks Dix, P.C., R. Kenneth Sparks, Colorado Springs, Petrie, Bauer & Vriesman, LLP, Andrew J. Petrie, Todd L. Vriesman, Susan N. Mickus, Denver, for Plaintiff–Appellant.

White & Steele, P.C., John M. Lebsack, Robert R. Carlson, Denver, for Defendant–Appellee Kip Hampden, Ltd., a Colorado Limited Partnership.

Strand, Meadows, and Webb, William G. Webb, Colorado Springs, for Defendants–Appellees Lincoln DeVore, Inc. and George Morris.

Opinion by Judge DAVIDSON.

Plaintiff, Vikell Investors Pacific, Inc., (Vikell) appeals from a judgment entered on a jury verdict finding defendant Kip Hampden, Ltd., (Kip Hampden) not liable for the subsidence of real property owned by Vikell. Vikell also appeals from a directed verdict by the trial court dismissing its claim against defendants George Morris and his company, Lincoln DeVore, Inc., (collectively Morris) for breach of fiduciary duty. We affirm.

This controversy centers around the subsidence of a hill in Colorado Springs. Vikell owned real property at the top of the hill, located on which was a large apartment complex called Woodstone Apartments (Woodstone). Kip Hampden owned adjoining property, occupied by a car dealership, at the bottom of the hill, directly below Woodstone.

In 1987, Kip Hampden decided to improve its property by grading the base of the hill and expanding a parking lot used by the car dealership. Kip Hampden hired Morris, an engineering consultant, to determine whether the excavation could be done safely and, if so, to plan the project. After Morris tested the slope stability, which test revealed water seepage in the hillside, he issued a report to Kip Hampden indicating that the hillside was subject to movement and landslides. Nevertheless, the report included a detailed plan for grading the base of the hill and expanding the parking lot.

Pursuant to Morris' plan, Kip Hampden began the excavation and had thousands of

cubic yards of soil removed from the base of the hill below Woodstone.

In 1989, when Vikell acquired the Woodstone property, it hired several consultants and contractors to refurbish and repair the apartment complex, which had fallen into disrepair after its prior owner declared bankruptcy.

Vikell hired a soils engineer to examine several of the Woodstone buildings, which were experiencing foundation cracking and other problems. That engineer advised that the buildings were moving, causing the foundation cracking, and he identified three possible reasons: expansive soils, slope instability, and foundation settlement caused by consolidation of non-compact fill used in the original building construction. He recommended that Vikell pay special attention to controlling water in the hillside, which he indicated could be aggravating the building movement.

A structural engineer hired by the bankruptcy court in 1988 to help bring Woodstone up to a reasonable standard of maintenance also advised Vikell representatives that controlling water in and around the hillside was critical to the repair project because water could be aggravating any downhill building movement.

Pursuant to the engineers' recommendations, Vikell attempted to correct surface drainage problems and utility leaks in order to reduce the amount of water in the hillside and stop the building movement. After several repairs, all of the buildings stabilized with the exception of Woodstone buildings 410 and 420, which continued to move and crack.

In 1991, Vikell hired Morris as its new soils engineer to study and solve the remaining problems with building movement. Morris did not inform Vikell that Kip Hampden had excavated the base of the hill in 1987 or that he had worked for Kip Hampden on the project.

Morris first theorized that the movement of buildings 410 and 420 was due to simple building settlement, and he recommended pressure grouting beneath the buildings to provide them with additional support. When the buildings continued to move, Morris shifted his focus to water problems. He dug up various parts of Vikell's property to check for groundwater but, despite his earlier report to Kip Hampden that there was water seepage in the hillside, he found little, if any, water. Morris next recommended a second pressure grouting. After the second grouting, however, the building movement accelerated.

In 1994, Morris suggested that, although "unthinkable," the entire hillside might be subsiding toward Kip Hampden's property, causing buildings 410 and 420 to slide down the hillside. He performed a slope failure analysis and confirmed that the stability of the hillside had decreased. Morris' report also revealed that Kip Hampden had cut away the base of the slope in 1987. However, his report did not indicate that he had worked on the project.

Shortly thereafter, Vikell hired a new soils expert who investigated the nature and cause of the building movement and determined that Kip Hampden's removal of soil from the base of the hill contributed to the ongoing slope subsidence.

In 1995, major slope failures occurred and Vikell was forced to abandon and demolish buildings 410 and 420. Kip Hampden denied any responsibility for the slope failures. In a meeting between representatives of Vikell and Kip Hampden, Morris revealed for the first time that he was the soils engineer who had assisted Kip Hampden with its downhill excavation.

As a result of the damage caused by the slope subsidence, Vikell sued Kip Hampden for strict liability and for vicarious liability arising from Morris' allegedly negligent work in planning the 1987 excavation. Vikell also sued Morris directly for negligence and breach of fiduciary duty. The trial court directed a verdict in favor of Morris on the claim for breach of fiduciary duty. The remaining issues were submitted to a jury, which found that Kip Hampden was neither strictly liable nor vicariously liable, that Morris was not negligent, and that Vikell was negligent. This appeal followed.

## I.

Vikell first contends that the trial court erred in instructing the jury on the appropriate standard of strict liability in lateral support cases. Specifically, it maintains that it was error to instruct the jury that additional sub-surface water and groundwater are artificial additions or improvements that a plaintiff must prove did not materially contribute to slope subsidence. We disagree.

■ As a general matter, one who withdraws naturally necessary lateral support of land in another's possession is strictly liable for a subsidence of the land, as well as for harm to artificial additions resulting from the subsidence. Restatement (Second) of Torts § 817 (1979).

■ For strict liability to apply, however, a jury first must find that the weight of the buildings, artificial additions, and fill on the plaintiff's land did not materially increase the lateral pressure and thus that such added weight was not a proximate cause of the damage to the property. In fact, there is a legal presumption that the weight of the buildings, artificial additions, and fill did contribute to the subsidence, and the burden is on the plaintiff to overcome this presumption. *Gladin v. Von Engeln*, 195 Colo. 88, 575 P.2d 418 (1978).

Here, the trial court instructed the jury that:

> Kip Hampden, Ltd. alleges that the artificial additions and fill have created additional sub-surface water and groundwater on Plaintiff's property ... [and] [t]he burden is upon the Plaintiff to overcome this presumption ... and to prove ... that the additional sub-surface water and groundwater has not materially contributed to the existing subsidences....

The parties agree that Vikell's land, improved by Woodstone, was not in its natural state. They also agree that the weight of the Woodstone buildings did not significantly increase lateral pressure on the land and thus was not a proximate cause of the hill's subsidence. Furthermore, the parties do not dispute that additional sub-surface water and groundwater in the hill contributed to the hill's subsidence.

At issue, then, is whether collateral consequences of artificial additions to land—specifically, the additional water in the hill caused by the presence of the Woodstone complex—are incorporated in the legal presumption against strict liability.

Vikell contends that, according to *Gladin*, in order to overcome the legal presumption against strict liability, it must prove only that the weight of its buildings did not increase lateral pressure on the land and thus materially contribute to the hill's subsidence. Accordingly, Vikell contends that the trial court's instruction improperly included additional water in the legal presumption. In contrast, Kip Hampden contends that the instruction was proper because the legal presumption prescribed in *Gladin* is broad, extending beyond increased lateral pressure from the weight of buildings or improvements to include any changes to the land occurring as collateral consequences of artificial additions to the land. We agree with Kip Hampden.

In *Gladin*, the supreme court determined that the applicability of strict liability in a lateral support case hinges on whether an artificial condition created on the plaintiff's land contributed to the injury, or whether the subsidence would have occurred even if the land had remained in its natural state. That opinion makes it clear that increased lateral pressure from the weight of buildings or improvements is an artificial condition created on the land. However, neither *Gladin* nor any subsequent Colorado appellate court opinion has addressed the issue whether changes to the land occurring as collateral consequences of buildings or improvements also qualify as artificial conditions created on the land.

■ By common law tradition, a landowner is absolutely entitled to the lateral support of his or her soil in its natural state by the soil of adjoining lands. *See Sanders v. State Highway Commission*, 211 Kan. 776, 508 P.2d 981 (1973); *Prete v. Cray*, 49 R.I. 209, 141 A. 609 (1928); *Bay v. Hein*, 9 Wash.App. 774, 515 P.2d 536 (1973).

When land is no longer in its natural state, but has been filled or altered, the entitlement to lateral support from adjoining land is not forfeited, but the landowner is entitled only to the lateral support from adjoining property that the land would have needed in its natural state, before it was filled or altered. *See* Restatement (Second) of Torts § 817 comments b & d (1979); 8 D. Thomas, *Thompson on Real Property* § 69.02(b) (Thomas ed.1994); Annot., 50 A.L.R. 486 (1927).

The measure of this entitlement, and of the duty of the adjoining landowner to provide lateral support, is the natural dependence of the land, and the entitlement and duty are not enlarged by alterations of the natural condition. *See Puckett v. Sullivan,* 190 Cal.App.2d 489, 12 Cal.Rptr. 55 (1961); *Salmon v. Peterson,* 311 N.W.2d 205 (S.D. 1981); Restatement (Second) of Torts § 817 comment c (1979).

Similarly, land that is entitled to maintenance of lateral support from adjoining land likewise is expected to provide its own lateral support. 8 D. Thomas, *Thompson on Real Property,* § 69.01 (Thomas ed.1994). Strict liability does not apply in circumstances in which a subsidence of land is caused by the removal of additional lateral support required because alterations in the supported land have impaired its cohesiveness and stability. *See Gillies v. Eckerson,* 97 A.D. 153, 89 N.Y.S. 609 (N.Y.App.Div. 1904) (strict liability not applicable where one, by digging on land, superimposes unnatural weight, or decreases cohesive support, or in any other manner contributes to its insolidity); *Victor Mining Co. v. Morning Star Mining Co.,* 50 Mo.App. 525 (1892) (strict liability not applicable where mining operations on plaintiff's land so diminished the land's self-supporting power as to render insufficient otherwise adequate natural and permanent support); Restatement (Second) of Torts § 817 comment e (1979).

Underlying this limitation on strict liability is the fundamental notion that a landowner cannot, by placing improvements on its land, increase its neighbor's duty to support the land laterally. Otherwise, the party with the duty to maintain the lateral support would be responsible for improving the support to hold more than the natural land would have held. *See Klebs v. Yim,* 54 Wash.App. 41, 772 P.2d 523 (1989) (defendant not strictly liable for subsidence of land where plaintiffs failed to show that improvements on their land did not cause build-up of water pressure in the soil and subsequent collapse of defendant's retaining wall); *Salmon v. Peterson, supra* (defendant held strictly liable for subsidence of land after plaintiff introduced evidence to show that use of his land did not cause build up of water pressure in the soil and subsequent collapse of defendant's retaining wall); *cf. Prete v. Cray, supra* (bed of quicksand which extended into the soil of plaintiff's land was not an artificial condition caused by improvements on plaintiff's land).

In light of these principles, which emphasize a comparison of the support required by land in its natural state with the support required by the same land in its improved state, we conclude that, for purposes of strict liability in lateral support cases, any alteration by a plaintiff of its land, whether a purposeful improvement added to the land or an unforeseen collateral consequence of such an improvement, is an artificial condition on the land.

Here, because the jury found that the additional water in the hill was not a natural occurrence but was caused by Woodstone's construction, such water was necessarily an artificial condition on Vikell's land. Consequently, because according to *Gladin* the applicability of strict liability in a lateral support case hinges on whether an artificial condition created on the plaintiff's land contributed to the injury, we further conclude that the trial court's instruction properly included additional water in the legal presumption against strict liability.

Vikell, however, contends that, by including any additional water in the land associated with construction thereon as being an artificial addition or improvement that a plaintiff must prove did not contribute to slope subsidence, we are effectively eliminating strict liability as a claim for relief in all lateral support cases. We disagree. Nothing precludes a plaintiff from overcoming the

presumption against strict liability by proving that additional water—or any other collateral consequence of artificial additions to land—did not materially contribute to subsidence of its land. *See, e.g., Salmon v. Peterson, supra.*

■ Moreover, contrary to Vikell's contention that *Gladin* contradicts established tort principles, we note simply that actions for strict liability in lateral support cases involve an impure form of that theory. *See generally* W. Keeton, *Prosser & Keeton on Torts* §§ 75, 79, 81 (5th ed.1984). Although in a strict liability lateral support case there is a burden placed on a plaintiff to overcome the legal presumption that artificial conditions contributed to the subsidence of its land, nevertheless, once the plaintiff overcomes that presumption, it need prove merely that the withdrawal of such support was a cause of its damages.

## II.

Vikell also contends that the verdict on its strict liability claim was against the weight of evidence presented at trial. However, because we conclude that the jury was properly instructed, and because there is ample evidence in the record that Kip Hampden did not withdraw naturally necessary lateral support from Vikell's property, we will not disturb the jury's verdict. *See I.M.A., Inc. v. Rocky Mountain Airways, Inc.,* 713 P.2d 882 (Colo.1986) (for a properly instructed jury, its findings having record support are binding on appeal).

## III.

Vikell next contends that the trial court incorrectly identified the inherently dangerous activity undertaken by Morris and, as a result, erred in instructing the jury on Vikell's theory of vicarious liability against Kip Hampden. Kip Hampden asserts that Vikell did not object to the instruction with sufficient specificity to preserve the issue for appeal. Again, we agree with Kip Hampden.

■ As a general rule, a person hiring an independent contractor to perform work is not liable for the negligence of the independent contractor. However, when the work to be done is inherently dangerous, an employer cannot escape liability for such negligence by engaging an independent contractor to do the work. *Huddleston v. Union Rural Electric Ass'n,* 841 P.2d 282 (Colo.1992).

Here, Kip Hampden hired Morris as an independent contractor to plan its 1987 excavation. Vikell alleged that Morris' work for Kip Hampden was negligent and that this negligence directly resulted in the hill's subsidence and damage to Woodstone. Vikell then sought to impute liability for Morris' negligence to Kip Hampden on grounds that the excavation project was inherently dangerous.

At trial, Vikell offered, and the court refused, an instruction which provided that excavation was inherently dangerous as a matter of law. The trial court declined to determine whether Morris' work for Kip Hampden was inherently dangerous as a matter of law, and instead provided an instruction which let the jury, as fact-finder, make that determination.

The trial court instructed the jury that:

> If you find that the *provision of geotechnical services* with regard to a geological hazard zone constitutes an inherently dangerous activity, you are instructed that one carrying on an inherently dangerous activity must exercise the highest possible degree of skill, care, caution, diligence, and foresight ... [and] the failure to do so is negligence. (emphasis added)

On appeal, Vikell does not contend that the trial court erred in refusing to give its proposed instruction. Nor does Vikell argue, as it did in the trial court, that it was improper for the jury to determine what constituted an inherently dangerous activity. Instead, Vikell now contends that the trial court erred in instructing the jury that the allegedly inherently dangerous activity was "provision of geotechnical services" rather than "excavation." The result of this error, Vikell argues, is that the jury did not find Morris negligent and, therefore, did not find Kip Hampden vicariously liable for Morris' negligence.

We agree with Kip Hampden that Vikell's objection to the instruction in the trial court was for reasons other than those now raised on appeal.

 A general objection to an instruction is not sufficient to preserve a specific objection for appeal. Instead, counsel must state the specific grounds of his or her objections for consideration of the court, *Baum v. S.S. Kresge Co.*, 646 P.2d 400 (Colo.App. 1982), and only the grounds so specified shall be considered on appeal. Also, C.R.C.P. 51 mandates that a party must raise objections to jury instructions before the case is submitted to the jury. *Ross v. Colorado National Bank*, 170 Colo. 436, 463 P.2d 882 (1969).

 Here, the record reveals that Vikell's objection to the instruction given by the trial court was that the court should decide the inherently dangerous issue as a matter of law. At no time did Vikell object to the court's description or identification of what activity was allegedly inherently dangerous. There was no objection to "provision of geotechnical services" as it appeared in the instruction or as it appeared in the jury instruction outlining Vikell's theories of liability. The instruction outlining Vikell's theories of liability provided that Morris was allegedly negligent in designing and reviewing Kip Hampden's excavation project, and it specifically referred to Morris' work as "provision of geotechnical services."

Accordingly, we do not consider Vikell's objection to be a specific objection to the portion of the instruction that it now challenges on appeal. *See Montgomery Ward & Co. v. Kerns*, 172 Colo. 59, 470 P.2d 34 (1970); *Scheer v. Cromwell*, 158 Colo. 427, 407 P.2d 344 (1965); *Phillips v. Komornic*, 159 Colo. 335, 411 P.2d 238 (1966) (if an instruction was not framed in words sufficiently clear to be correctly applied by the jury, it was counsel's responsibility to direct attention to the faulty language to obtain a correction).

Neither did Vikell's proposed jury instruction address the issue Vikell raises now for the first time on appeal. As discussed, while the trial court's instruction allowed the jury to determine as fact whether Morris' work for Kip Hampden was inherently dangerous, Vikell's proposed instruction required the trial court to determine whether the work was inherently dangerous as a matter of law. Although Vikell's proposed instruction included the term "excavation," Vikell's argument was that its instruction should be given because the determination whether an activity was inherently dangerous was for the court, not the jury, to make. The description of the specific activity involved simply was not an issue and Vikell did not call the trial court's attention to the problem about which it now complains. *See Ross v. Colorado National Bank, supra; Scheer v. Cromwell, supra.*

Under these circumstances, we conclude that Vikell's objection now being asserted is untimely, not in compliance with C.R.C.P. 51 and, therefore, is waived. *See Scheer v. Cromwell, supra. See also Gilligan v. Blakesley*, 93 Colo. 370, 26 P.2d 808 (1933).

## IV.

Lastly, Vikell contends that, because an engineer-client relationship can give rise to a fiduciary relationship in certain factual circumstances, the trial court erred in directing a verdict here in favor of Morris on Vikell's claim for breach of fiduciary duty. We disagree.

 Before there can be a breach of fiduciary duty, there must be, among other things, either a fiduciary relationship, *see Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo.1993), or a confidential relationship. *See Nicholson v. Ash*, 800 P.2d 1352 (Colo. App.1990).

Certain recognized relationships, such as the relationship between a trustee and a beneficiary, give rise to general fiduciary duties. However, a fiduciary relationship can also arise between individuals through a relationship of trust, confidence, and reliance.

 A fiduciary relationship generally arises when one party has a high degree of control over the property or subject matter of another, when the benefiting party places a high level of trust and confidence in the fiduciary to look out for the beneficiary's best interest, or when one party relies on anoth-

er's high degree of expertise in an area. *Bailey v. Allstate Insurance Co.*, 844 P.2d 1336 (Colo.App.1992).

█ Similarly, a confidential relationship may arise when one party justifiably imposes special trust and confidence in another, so that the first party relaxes the care and vigilance that he or she would normally exercise in entering into a transaction. The confidential relationship, however, must be established prior to the date of the transaction that gives rise to the claim. *See Nicholson v. Ash, supra.*

█ Vikell does not contend that an engineer-client relationship in and of itself triggers fiduciary duties. Nonetheless, it contends, because Morris had superior knowledge of the Kip Hampden excavation and because Vikell placed a high degree of trust and confidence in Morris' advice and expertise, a jury could determine that a fiduciary or confidential relationship arose between the parties. We do not agree.

Viewing the evidence in the light most favorable to Vikell and indulging every reasonable inference that can be drawn in its favor, as we must, *see Evans v. Webster*, 832 P.2d 951 (Colo.App.1991), we conclude that the trial court correctly determined that the evidence presented at trial was susceptible to a single conclusion—that the undisputed facts of the case did not give rise to either a fiduciary relationship or a confidential relationship between Vikell and Morris.

Here, Morris was just one member of a team of people working for Vikell on the Woodstone project. In addition to two civil engineers, a structural engineer, and a contractor, there were also three soils engineers who were involved with the project. Morris, the second soils engineer brought on, was hired to give a second opinion on slope stability at the site.

Further, Morris rarely spoke to Vikell. Instead, at Vikell's direction, he rendered his advice and recommendations on the project not to Vikell itself, but to an engineer who was on site for the duration of the project and who was Vikell's employee, agent and chief consultant. At the same time, that on-site engineer received the advice and recommendations of the other engineers working on the project. Vikell implemented Morris' recommendations, and the recommendations of the other engineers, only after they were reviewed, modified, or rejected by its on-site engineer.

Under the circumstances here, Morris had little, if any, practical control over the Woodstone repair project. *Cf. Paine, Webber, Jackson & Curtis v. Adams*, 718 P.2d 508 (Colo.1986) (practical control of a client's trading account by a broker establishes a fiduciary duty). Control over the project was vested in Vikell's on-site engineer; each of the other consultants, including Morris, was responsible only for a piece of the project.

Nor, under these circumstances, did Vikell exhibit full trust in Morris or relax its vigilance over his work. *Cf. Dolton v. Capitol Federal Savings & Loan Ass'n*, 642 P.2d 21 (Colo.App.1981) (fiduciary or confidential relationship may arise from a relationship which impels or induces one party to relax care and vigilance it would and should have ordinarily exercised in dealing with a stranger). Morris' role, and the role of the other consultants, was limited to providing recommendations for review by the on-site engineer.

In addition, there was no evidence presented that Vikell and Morris had any relationship at all prior to Morris' employment by Vikell. Thus, there was no pre-existing relationship of trust between Vikell and Morris, which, as noted, is a requirement for a confidential relationship to exist. *See Nicholson v. Ash, supra.*

Nor, finally, was there any evidence that Morris undertook to advise Vikell in any capacity other than in his capacity as an engineer in a typical professional relationship. *Cf. Destefano v. Grabrian*, 763 P.2d 275 (Colo.1988) (fiduciary duty to refrain from actions that might harm parishioners' marital relationship, such as engaging in sexual relationship with the wife, was created when priest undertook to provide marriage counseling to the parishioners).

Accordingly, because the only possible interpretation of the evidence was that the

relationship between Vikell and Morris did not extend beyond that of a professional engineer and his client, the trial court properly granted Morris' motion for a directed verdict. *See Paine, Webber, Jackson & Curtis v. Adams, supra* (if evidence introduced is susceptible to only one reasonable interpretation, then, even if a determination of fact is necessary, a directed verdict is proper); *Tri–Aspen Construction Co. v. Johnson,* 714 P.2d 484 (Colo.1986) (trial court should take an issue from the jury only in the absence of evidence upon which a jury could justifiably determine the issue for the party opposing the directed verdict).

The judgment is affirmed.

STERNBERG, C.J., and PLANK, J., concur.