574 So.2d 1324 (1990)
James WILSON, Jr.
v.
STATE of Mississippi.
No. 89-KA-0301.
Supreme Court of Mississippi.
December 19, 1990.
Rehearing Denied February 6, 1991.
*1325 Barry H. Powell, Thomas Price Alston, Jones & Davis, Dennis L. Horn, Horn & Payne, Jackson, Grady F. Tollison Jr., Tollison & Alexander, Oxford, for appellant.
*1326 Mike C. Moore, Atty. Gen., Marvin L. White, Jr., and Wayne M. Snuggs, Asst. Attys. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
William L. Denton, Denton & Tyler, Biloxi, Lewis H. Burke, Vicksburg, Floyd Abrams, Cahill Gordon & Reindel, Laurence T. Sorkin, Anthony Paduano and John Holdridge, Cahill Gordon Firm, New York City, Luther T. Munford, Phelps Dunbar Marks Claverie & Sims, Jackson, for amicus curiae.
En Banc.
SULLIVAN, Justice, for the Court:
On Thursday, November 20, 1986, at approximately 3:00 o'clock P.M., Mrs. Sungok (Gloria) Im was murdered during an apparent robbery of the Continental Wig Shop located across Bailey Avenue from the Jackson Mall in Jackson, Mississippi. An autopsy revealed numerous stab wounds and lacerations. Her throat had been so severely slashed that she was almost decapitated. James Wilson, Jr., was indicted and charged with the commission of this murder. The first trial resulted in a hung jury. Wilson was re-indicted as an habitual offender and the second jury found Wilson guilty but was unable to agree on a sentence. Wilson, a recidivist, was then sentenced to life imprisonment without the benefit of probation or parole.

I.

WAS WILSON'S RIGHT TO COUNSEL VIOLATED BY HIS LINEUP IDENTIFICATION?
Ellis Ray Manuel had a face to face confrontation with Wilson in the Wig Shop after the murder of Mrs. Im.
Wilson was displayed to Manuel as part of a five man lineup. Also present to view the lineup was Wilson's attorney, Doc Kellum. No objection was made to the manner in which the lineup was conducted. After viewing the array, Manuel was escorted from the viewing room to an adjacent hallway where he identified Wilson as the armed assailant from the wig shop on the day Mrs. Im was murdered. There was no objection to this procedure.
While Kellum did not accompany Manuel and the police officers into the hallway, the record does not indicate that he was precluded from doing so.
In the context of lineups we have held that an accused has the right to have his counsel present during the lineup. Magee v. State, 542 So.2d 228, 233 (Miss. 1989); Jimpson v. State, 532 So.2d 985, 989 (Miss. 1988); Nicholson v. State, 523 So.2d 68, 77 (Miss. 1988). In the same context, an accused does not enjoy the right to counsel during a photographic lineup. See Magee, 542 So.2d at 233; Nicholson, 523 So.2d at 71-72; Johnson v. State, 359 So.2d 1371, 1374 (Miss. 1978). See also, United States v. Ash, 413 U.S. 300, 321, 93 S.Ct. 2568, 2579, 37 L.Ed.2d 619 (1973).
The post-viewing confrontation between Manuel and the police was not a "confrontation" between Wilson and the police. In Jimpson, 532 So.2d at 989, we specifically recognized that an accused enjoys the right to counsel at a lineup. We now hold that only an actual confrontation with the defendant at a lineup is the critical stage which requires the right to counsel. Wilson was not present at the post-lineup encounter between Manuel and the police and there was no "actual confrontation" between Wilson and the witness. Therefore, the presence of counsel is not required. We note that counsel for the defendant did not request a post viewing interview with Manuel. This assignment of error is without merit.

II.

WAS THE LINEUP SO SUGGESTIVE AS TO VIOLATE DUE PROCESS OF LAW?
Wilson argues first that the actual live lineup was a per se violation of his due process rights because Manuel had failed to identify Wilson from any pictorial lineup administered prior to the live lineup. The record indicates that the photograph used in the pictorial lineup was eight years old and there was testimony at the trial that *1327 Wilson's appearance had changed since that photo was taken.
In Robinson v. State, 473 So.2d 957, 961 (Miss. 1985), a witness was unable to identify a defendant from a photograph on the night of the robbery but subsequently did identify the defendant in a photographic lineup. We ruled that these grounds were insufficient to prevent an in-court identification by the witness.
In Magee v. State, 542 So.2d 228, 232-33 (Miss. 1989), a robbery victim was unable to identify the defendant from a live lineup. The next day she positively identified the defendant from a photographic lineup. In spite of the fact that the defendant was the only person who appeared in both the photo lineup and the actual lineup, we found no merit to the contention that the trial court erred in allowing the victim's identification testimony. We followed United States v. O'Neal, 496 F.2d 368, 372 (6th Cir.1974), and said:
The initial misidentification on the part of these eyewitnesses to a crime did not completely destroy the value of their testimony or render it inadmissible. The jury was fully advised of the original mistake and had it as well as the subsequent testimony identifying appellant before them to weigh. The weight to be given this evidence was for the jury to determine.
We have already rejected the rationale upon which Wilson bases his argument that the trial court committed a per se violation of due process and we reject it again.
As a second point, Wilson argues that Manuel's identification of Wilson "cannot stand in light of Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972)." We have recognized many times that the Biggers factors come into play only if the identification procedure utilized was impermissibly suggestive. Jones v. State, 504 So.2d 1196, 1199 (Miss. 1987).
In York v. State, 413 So.2d 1372, 1383 (Miss. 1982), we discussed at length allegedly suggestive pre-trial procedures and their effect on in-court identification:
Only pretrial identifications which are suggestive, without necessity for conducting them in such manner, are proscribed. A lineup or series of photographs in which the accused, when compared with the others, is conspicuously singled out in some manner from the others, either from appearance or statements by an officer, is impermissibly suggestive. (citations omitted.)
An impermissibly suggestive pretrial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure, unless: (1) from the totality of the circumstances surrounding it (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.
Even if testimony is proffered of the out-of-court identification itself, the same standard exists as to the above, with the omission of the word `irreparable'.
An unnecessarily suggestive pre-trial identification does not prevent an in-court identification by an eyewitness "... unless from the totality of the circumstances the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Nixon v. State, 533 So.2d 1078, 1087 (Miss. 1987); Goggins v. State, 529 So.2d 649, 652-53 (Miss. 1988); Wash v. State, 521 So.2d 890, 895 (Miss. 1988); York v. State, 413 So.2d 1372, 1383 (Miss. 1982). Upon reviewing a photograph of the lineup participants, we find nothing that would distinguish Wilson from the other participants in the lineup. Nothing in the trial record indicates that Wilson was singled out in any way. The identification procedure was not impermissibly suggestive and therefore, the Biggers factors do not even come into play.
Assuming arguendo, that the lineup was impermissibly suggestive, Manuel's identification does not have to be excluded "if upon consideration of the totality of the circumstances there was no substantial *1328 likelihood of misidentification." Lannom v. State, 464 So.2d 492, 494 (Miss. 1985). The standards to be considered under these circumstances are:
(1) Opportunity of the witness to view the accused at the time of the crime;
(2) The degree of attention exhibited by the witness;
(3) The accuracy of the witness's prior description of the criminal;
(4) The level of certainty exhibited by the witness at the confrontation;
(5) The length of time between the crime and the confrontation.
Nixon, 533 So.2d at 1087; Goggins, 529 So.2d at 652-53; Wash, 521 So.2d at 895-96; Lannom, 464 So.2d at 494-95; York, 413 So.2d at 1383; Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977); Neil, 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411.
With these standards in mind, we note:

(1) Opportunity to be observed.

At the suppression hearing, Manuel testified that he viewed the suspect under bright lighting from a distance of three to four feet for approximately three minutes. While the trial judge expressed his doubts as to whether Manuel actually stood and watched an individual armed with a knife advance toward him for three minutes, he did determine that the witness had an ample opportunity to view the face of the suspect.

(2) Degree of attention.

Manuel testified that as he backed away from the assailant, he kept an eye on him at all times. At the trial Manuel testified that he focused on the assailant from the time he exited the shop to when he reached the vegetable vendor across the street.

(3) Accuracy of prior description.

Manuel described the assailant as a black man, 35 to 42 years of age, between 5'10" and 6' tall, weighing between 210 and 240 pounds, and having a mustache. Detective Crisco verified Manuel's description of the assailant. At the time of the crime, Wilson, a 40 year old black man, stood 5'10" tall, weighed 200 pounds, and had a mustache.

(4) Level of certainty at confrontation.

Manuel testified that there was no doubt in his mind that when he identified Wilson from the lineup, that Wilson was the assailant. Detective Crisco testified that Manuel made a very positive, immediate identification of Wilson from the lineup.

(5) Time between the crime and the confrontation.

Manuel saw the assailant at the Continental Wig Shop on November 20, 1986, and viewed the defendant in a police lineup on December 2, 1986. A total of only twelve days elapsed from the time of the crime until the time of the lineup.
The foregoing facts establish that substantial credible evidence supports the trial judge's determination that this identification should not be suppressed.

III.

DID THE TESTIMONY OF THE OUT-OF-COURT IDENTIFICATION OF THE DEFENDANT CONSTITUTE AN IMPERMISSIBLE "BOLSTERING" OF THE WITNESS'S IN-COURT IDENTIFICATION?
Wilson argues that because the lineup violated his right to counsel and entitlement to due process of law, the trial court erred in allowing Manuel to identify Wilson as the assailant before the jury. He further urges that the trial court erred in allowing Detective Crisco to testify regarding Manuel's lineup identification of Wilson.
In Fells v. State, 345 So.2d 618, 622 (Miss. 1977), we recognized that a primary witness may testify concerning an out-of-court identification. Fells also held that if the primary witness' testimony is impeached, independent evidence of the out-of-court identification may be introduced by a third person. In this case the third person was Detective Crisco.
We have already determined that Wilson was not deprived of counsel nor of his due process rights. Therefore, the evidence of Manuel's out of court identification of Wilson was admissible. Furthermore, once *1329 Wilson sought to impeach Manuel's identification, the door was opened for Detective Crisco's testimony concerning the out-of-court identification.
In Livingston v. State, 519 So.2d 1218, 1221 (Miss. 1988), we addressed the same issue and said, "... the new Mississippi Rules of Evidence provide that such identification evidence is not hearsay and is admissible as substantive material (See Rule 801(D)(1)(C))." See also, Jimpson, 532 So.2d at 989-90.
This assignment of error is without merit.

IV.

WHETHER IDENTIFICATION EVIDENCE SHOULD HAVE BEEN SUPPRESSED BECAUSE THE STATE FAILED TO PRESERVE THE NOVEMBER 25, 1986, PHOTOGRAPHIC LINEUP?
This argument is based upon California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), wherein Justice Marshall wrote that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 488-89, 104 S.Ct. at 2534, 81 L.Ed.2d at 422.
We first note that Wilson admits that the Jackson Police Department did not destroy the pictures in any kind of calculated effort to weaken Wilson's case. What occurred was this. Detective Crisco testified that when it was determined that James Wilson's Grand Prix was the possible vehicle driven by the murderer, Wilson's record was pulled. Included in this record was a 1978 photograph of Wilson, which was shown to Manuel along with four other photographs of black men of similar age and facial characteristics. When Manuel was unable to make a positive identification of the assailant from the photo lineup, the pictures "... were probably put back in the filler box or in somebody's desk drawer, perhaps mine. I don't know." Detective Crisco stated that he did not know whose photographs were used in the lineup. "Had an identification been made, then all five of the photographs would have been logged into evidence and we would have those photographs at this time. An identification was not made, therefore, I didn't keep them, either keep them or list them as evidence."
In Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289 (1988), the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (Emphasis added). Here there was no bad faith on the part of the Jackson Police Department which Wilson admits. Therefore, there was no denial of due process. Furthermore, the record does not reflect that the other four photographs from the lineup would have played a significant role at Wilson's trial. Therefore, this assignment of error is without merit.

V.

WHETHER WILSON WAS IMPERMISSIBLY INTERROGATED AFTER INVOKING HIS RIGHT TO COUNSEL?
This is an area of the law that creates grave problems and is always approached with great caution by this Court. The crux of this assigned error here involves statements Wilson made to Detectives Jordan and Erickson on November 26, 1986. At the suppression hearing, Detective Jordan testified that he and Detective Erickson removed the defendant from his cell and brought him to the interview room for the purpose of questioning him concerning the murder. After being advised of his constitutional rights, Wilson refused to answer any questions and invoked his right to counsel. Detective Jordan then testified as follows:

*1330 We then explained to him that at some point in time... he was going to be required to stand in a police lineup and we explained to him there that he also had the right to counsel and that he could waive that right also and go ahead and stand in a lineup without a lawyer being present. We also have a form which spells that out and he refused to sign it, stating that he would rather wait for a lawyer before he stood in a lineup... .
Right after that he asked us exactly what he was being charged with and we told him he was being charged with capital murder in the stabbing death of a lady that ran the Continental Wig Shop on Bailey Avenue... .
Once it was explained exactly he was charged with, he made the statement, "That couldn't have been me. I was at work that day."
Wilson contends that the explanation of lineup procedures constituted further interrogation in violation of Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378, 385-87 (1981). He contends that the state never ceased its questioning.
This record does not indicate that the detectives explained the lineup procedures for the purpose of eliciting incriminating statements from the defendant. "[T]he mere possibility of incrimination does not mean that an interrogation occurred." Woodward v. State, 533 So.2d 418, 430 (Miss. 1988); Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).
It cannot be said that the explanation of lineup procedures to Wilson constituted words or actions reasonably likely to elicit an incriminating response. On this basis alone this assignment of error is without merit.

VI.

WHETHER PROBABLE CAUSE EXISTED WHICH WARRANTED WILSON'S ARREST?
Wilson contends that at the time of his arrest there was no probable cause for it. He argues that the only evidence possessed by the state was:
(1) His fingerprints which were only one from a group of nineteen that came from the wig shop;
(2) That James Wilson had been convicted of armed robbery/attempted rape in 1971;
(3) Manuel could not identify Wilson from a photo spread as the assailant;
(4) Manuel could not positively identify Wilson's car as the one in which he saw the assailant flee.
Wilson states that this clearly is not evidence making it reasonable to infer that Wilson was the person who robbed the wig shop.
In Henry v. State, 486 So.2d 1209, 1212 (Miss. 1986), we said that to make an arrest for a felony, with or without a warrant, "a police officer must have (1) reasonable cause to believe a felony has been committed; and, (2) reasonable cause to believe that the person proposed to be arrested is the one who committed it... . `Probable cause' means less than evidence which would justify condemnation, but more than bare suspicion." (Emphasis added).
Powe v. State, 235 So.2d 920, 922 (Miss. 1970), states:
It has been said that ordinarily, when the trustworthy evidence makes it clear that an offense has been committed and that a particular person was on the scene at the time it was committed, and then available evidence makes it reasonable to infer that the particular person not necessarily was, but may have been, one of the offenders, most discreet and prudent men would order that person's arrest. (Emphasis added).
Prior to Wilson's arrest, police investigators knew:
(1) Wilson's fingerprints were found on the glass counter top directly in front of the missing wig head and that this counter top was cleaned daily;
(2) The assailant fled from the wig shop in a 1971 or 1972 white over black Pontiac *1331 Grand Prix that had a license plate which began with the letter "G";
(3) Aided by a computer printout, detectives determined that Wilson owned a car which matched this description;
(4) Officers discovered this car "sitting on blocks" on Mobile Street and the top appeared to have been recently primed;
(5) Manuel's description of the assailant reasonably mirrored Wilson's appearance as set out in police records.
The foregoing establishes that the warrant for Wilson's arrest was based upon more than a bare suspicion and was issued upon probable cause, and that Wilson's arrest was legal.

VII.

WHETHER THE FRUITS OF THIS UNLAWFUL ARREST SHOULD HAVE BEEN SUPPRESSED?
This assignment of error presupposes that Wilson's arrest was illegal. Probable cause existed to justify Wilson's arrest and therefore the evidence seized, the identification and Wilson's statements were all admissible. This assignment of error is without merit.

VIII.

WHETHER THE TRIAL COURT ERRED IN DISQUALIFYING ILLITERATES AND IN ALLOWING VENIRE PERSONS OVER THE AGE OF 65 TO CLAIM THEIR STATUTORY EXEMPTION?
We are asked to declare Miss. Code Ann., § 13-5-1 (1972), unconstitutional because disqualifying a person unable to read and write from jury service constitutes "intentional discrimination against illiterates." We are also told that there is no sufficient reason for excluding those over the age of 65 and therefore, we should hold Miss. Code Ann., § 13-5-25 (1972), unconstitutional. At the trial the judge discharged one venire person who could not read or write, and five persons over the age of 65 claimed the statutory exemption and declined to serve on the jury.

LITERACY REQUIREMENT
In Terrell v. State, 262 So.2d 179 (Miss. 1972), we addressed the predecessor statute to § 13-5-1 (1972), which also required that a prospective juror be able to read and write. We said:
With the infinite variety of cases now in our courts and the multitude of written documents entered into evidence, the requirement that a juror be able to read and write is a reasonable and nondiscriminatory regulation which operates equally against all persons tried by juries. No advantage is afforded to the State which is not also afforded to the defendant. This requirement is just as essential to the State's obligation to afford the accused a fair trial as it is to assure a fair trial for the State. State v. Comeaux, 252 La. 481, 211 So.2d 620 (1968). We are acquainted with no authority to the contrary.
Id. at 180.
The power to prescribe the qualifications for jurors rests with the legislature. State v. Hall, 187 So.2d 861 (Miss. 1966). The legislature has a right to impose reasonable qualifications for jurors when such qualifications do not violate the constitutional rights of accused persons to be tried by an impartial jury. Shows v. State, 267 So.2d 811, 812 (Miss. 1972).
Alderman v. Austin, 663 F.2d 558 (5th Cir.1981), argued by Wilson, does not support his contention that requiring jurors to be able to read and write constitutes intentional discrimination against illiterates. Alderman v. Austin involved a Witherspoon v. Illinois, 391 U.S. 510, 521, 88 S.Ct. 1770, 1776, 20 L.Ed.2d 776, 784 (1968), challenge that the defendant had been convicted to death by a jury that was composed of individuals "uncommonly willing to condemn a man to die." Neither Alderman nor Witherspoon lend any credence to Wilson's literacy requirement argument. Our holding in Terrell remains intact. The literacy requirements of § 13-5-1 are constitutional.

*1332 AGE PRIVILEGE
Section 13-5-25 (1972) does not bar persons over 65 years of age from serving on a jury. That statute merely grants those individuals the privilege to claim an exemption should they desire not to serve. Adams v. State, 537 So.2d 891, 893-95 (Miss. 1989). There is no statutory exclusion forbidding people from serving on juries and therefore, Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), which condemned an automatic statutory exclusion of women, is not on point. This assignment of error is wholly without merit.

IX.

WHETHER THE TRIAL COURT ERRED IN NOT GRANTING WILSON'S MOTION FOR A MISTRIAL BECAUSE A VENIRE PERSON ASSUMED A GROUP SHE SAW WALKING THROUGH THE COURTHOUSE TO BE THE VICTIM'S FAMILY?
During voir dire, a potential juror, Eula Stanley, remarked that she had observed a group she thought to be the victim's husband and three daughters "walking between the Auditorium ... and the Courthouse." A motion to quash the venire was denied by the court. As authority that the trial court erred, Wilson cites Fuselier v. State, 468 So.2d 45 (Miss. 1985). However, that case involved a situation quite unlike the one before us. In Fuselier, we held that the trial court erred in allowing the victim's daughter to sit at the counsel table within the rail of the courtroom with the district attorney. In finding that this practice was inflammatory and prejudicial to the defendant's case, we noted that her presence at the prosecutor's table and her open display of emotion presented the jury with the image of a prosecution acting on her behalf. In this case no action by the prosecution presented the victim's family in such light. The district attorney did not inform the venire person that the people she observed were the victim's family, she merely assumed that they were. These people were simply observed by a potential juror who was ultimately struck by the defense from serving on the jury.
In Irving v. State, 361 So.2d 1360 (Miss. 1978), we upheld the trial court's denial of defendant's motion for a mistrial where a potential juror stated, "Judge, the murdered man is my brother." In holding that nothing in the record revealed that any member of the jury or the panel was tainted by that remark, we noted that the appellant conducted extensive measures in examining prospective jurors on voir dire. In this case, an extensive examination of potential jurors occurred. We find nothing to indicate that any juror was affected by the victim's family, if that's who they were, walking through the courthouse. There is no merit to this assignment of error.

X.

SHOULD THE SECOND INDICTMENT HAVE BEEN QUASHED?
Wilson has already been tried for the capital murder of Mrs. Im under a prior indictment. In the first trial the jury could not agree upon a verdict and a mistrial was granted. Wilson was re-indicted by another grand jury and charged with capital murder of Mrs. Im. The second indictment differed from the first in that in addition to the $70.00 taken during the course of the robbery, Wilson was alleged to have taken a wig or other things of value from the victim. It also differed in that it charged Wilson as an habitual criminal as defined by Miss. Code Ann., § 99-19-81 (Supp. 1990).
With the return of the second indictment by the grand jury, the prosecution moved the court to enter a nolle prosequi on the first indictment. This motion was granted by the trial court. The defense filed a motion to quash the second indictment alleging that Wilson was facing double jeopardy and this motion was denied.
For an accused to stand trial again when the first trial resulted in a hung jury is not a violation of the double jeopardy clause. Wallace v. State, 466 So.2d 900 (Miss. 1985).
*1333 Wilson argues that the double jeopardy clause prohibits re-indictment and re-trial for the purpose of allowing the prosecution to strengthen its case. Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). Wilson's argument is that there was no manifest necessity for dismissing the first indictment and that he should not have been re-indicted with the additional allegations concerning the theft of the wig and his habitual offender status.
We find no variance between the indictments, the proof offered and the defense asserted. Any evidence that might be introduced to refute the allegation that Wilson stole money from the wig shop during the murder, would also serve as a defense to the additional allegation that a wig was stolen. Nothing indicates that the allegation regarding the wig strengthened the prosecution's case against Wilson or that he was in any way subjected to double jeopardy. The evidence presented by the prosecution for the alleged offense of capital murder was the same whether the indictment was for the theft of the wig or not. The second indictment in no way charged Wilson with a different or additional offense. United States v. Monroe, 164 F.2d 471, 475 (2nd Cir.1947).
Wilson's position is grounded on McNeal v. Hollowell, 481 F.2d 1145 (5th Cir.1973). Wilson's castle is built on sand. In McNeal, the prosecutor requested the nolle prosequi because a government witness offered surprise testimony which did not substantiate the government's case. The defense objected and requested that the trial be continued to a conclusion on its merits or, if the government had no further proof, a directed verdict of acquittal. The trial court granted the prosecutor's motion and discharged the jury, stating that the prosecutor had found out after getting into the trial that he was unable to make out his case. The Fifth Circuit specifically held that "granting of the nolle prosequi in order to allow the State an opportunity to shore up that weakness violated McNeal's Fifth and Fourteenth Amendment rights." 481 F.2d at 1152.
That is not the situation we face in Wilson. The mistrial here was declared because of a hung jury and not a crawfishing state witness. The prosecutor in Wilson did not abort the first trial to seal leaks in his case. In McNeal, the Fifth Circuit determined that none of the factors relied upon in making the motion for nolle prosequi arose to the level of "manifest necessity" which would require a mistrial. However, it is ancient and well recognized law that a hung jury is a manifest necessity that does require a mistrial. United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824).
In Ellis v. State, 469 So.2d 1256, 1258 (Miss. 1985), quoting from Shelby v. State, 246 So.2d 543, 546 (Miss. 1971), we said:
It is well settled in this state ... that a change in the indictment is permissible if it does not materially alter facts which are the essence of the offense on the face of the indictment as it originally stood or materially alter a defense to the indictment as it originally stood so as to prejudice the defendant's case.
The second point of contention raised by Wilson is that the prosecution cannot amend an indictment by adding, for the first time, that the defendant is charged as an habitual offender. For this he relies upon Akins v. State, 493 So.2d 1321 (Miss. 1986). He has misread Akins which held that a trial court may not amend indictment to change the charge in the indictment to another crime, except by action of the grand jury who returned the indictment. We point out that the second indictment in Wilson's case was not an amendment of the original indictment on motion by the state, it was a second indictment returned by a grand jury. Akins allows this.
There is no merit to this assignment of error.

XI.

WAS IT ERROR TO ALLOW EXPERT TESTIMONY THAT MATCHED SCRATCHES ON TOP OF THE GLASS DISPLAY CASE WITH THE BACKGROUND LINES FOUND ON THE PALM PRINT?
Wilson argues that Gary Jones, a fingerprint specialist for the FBI, should not *1334 have been allowed to testify regarding his comparison of the background lines found on a palm print with the scratches on the glass counter top from where the latent print was lifted. The argument here is that this constitutes novel scientific theory for which there is no general acceptance. Therefore, according to the comments of Rule 702 of the Mississippi Rules of Evidence, the testimony was inadmissible.
Rule 702, M.R.E. states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In considering the admissibility of an expert's testimony, we ask: "[i]s the field of expertise one in which it has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion? Where the answer to this question is in the affirmative, we generally allow expert testimony." House v. State, 445 So.2d 815, 822 (Miss. 1984). See May v. State, 524 So.2d 957, 963 (Miss. 1988).
The admissibility of a fingerprint expert's testimony concerning his comparison of the background materials lifted with the latent print has not been addressed by this Court.
The qualifications of an expert in applicable fields of scientific knowledge is left to the sound discretion of the trial judge. His determination on this issue will not be reversed unless it clearly appears that the witness was not qualified. Smith v. State, 530 So.2d 155, 162 (Miss. 1988). Fingerprint examination is a field of knowledge which has gained a "general acceptance." Agent Jones was qualified to testify as a fingerprint expert. The practice of fingerprint examination necessarily involves the observation and comparison of background materials lifted with the latent prints. It is an integral part of fingerprint examination.
This expert testimony was admissible. The judge determined that Wilson's objection went to the weight of the expert's testimony and not to its admissibility. Furthermore, the defendant cross-examined Agent Jones extensively. The jury was free to accept or reject the testimony as they were with any other witness.
It is little more than metaphysical fragmentation to argue that background comparison is not a scientifically established field of endeavor that has gained general acceptance when it is a necessary part of fingerprinting. If this were so an integral part of the established procedure utilized in fingerprint identification would not be acceptable in evidence. This is just not so. Agent Jones' expert testimony was deduced from a well-recognized scientific principle which has gained general acceptance and the trial judge did not abuse his discretion in allowing that testimony into evidence.

XII.

DID THE TRIAL COURT ERR IN ADMITTING THE COUNTER TOP INTO EVIDENCE?
The argument here is that the murder occurred on November 20, 1986, and the counter top from which Wilson's fingerprints were lifted, remained in use at the wig shop until it was seized by Jackson police on January 21, 1988. Wilson argues that the state has failed to establish chain of custody.
In Evans v. State, 499 So.2d 781, 783 (Miss. 1986), we said:
Physical objects which are relevant and for which the chain of custody is not broken or which are otherwise identified with certainty are admissible in evidence. Fondren, Miss.Crim.Trial Prac. § 20-38 (1980). Matters regarding the chain of custody of evidence are largely within the discretion of the trial court, and absent an abuse of discretion, this Court will not reverse. Morris v. State, 436 So.2d 1381, 1388 (Miss. 1983).
*1335 Should a chain of custody objection arise, the trial court should inquire whether there is any indication or reasonable inference of probable tampering with or substitution of the evidence. Doby v. State, 532 So.2d 584, 588 (Miss. 1988); Lambert v. State, 462 So.2d 308, 312 (Miss. 1984). At trial here the testimony reveals that the counter top was identified with certainty and that there was no indication or reasonable inference that it had been tampered with or substituted. Dino testified that the counter top had not been damaged or altered in any way between the time of the murder and when the officers came to retrieve it. There is no merit to this assignment of error.

XIII.

DID THE TRIAL COURT ERR IN ALLOWING AN ACCIDENT RECONSTRUCTION SPECIALIST TO TESTIFY?
Donald Rawson, the expert in question, is an agent who is an employee with the Mississippi Highway Safety Patrol and he testified that in his expert opinion the damage to Mrs. Im's van was consistent with having come into contact with the right front bumper of the Wilson's Grand Prix.
We need not repeat the just stated rule on admission of expert testimony.
Here Wilson contends that no predicate was laid to indicate that this witness could state with certainty that the dent in the van was caused by the Grand Prix' bumper. Wilson claims that under Hollingsworth v. Bovaird Supply Co., 465 So.2d 311, 315 (Miss. 1985), accident reconstruction specialists' testimony is limited to the relative speed of the two vehicles, the angle of the vehicles at impact and the vehicles' course of travel.
We do not read Hollingsworth to be so limiting. The language to which Wilson refers came from a concurring opinion in Hagan Storm Fence Co. v. Edwards, 245 Miss. 487, 148 So.2d 693 (1963), which the Hollingsworth court expressly overruled by allowing expert accident reconstruction opinions in our courts.
In Whittington v. State, 523 So.2d 966, 975 (Miss. 1988), we ruled that an accident reconstructionist was properly permitted to testify as to whether the tire mark at the edge of the pavement at the accident scene was an acceleration mark as opposed to a skid mark. In so doing, we expressly recognized that the testimony of accident reconstruction specialists is allowed in criminal cases in this State.
In Moffett v. State, 540 So.2d 1313, 1314 (Miss. 1989), a culpable negligence manslaughter case, Sgt. Rawson, as a specialist in accident reconstruction, gave his conclusions regarding the accident. In short, our law recognizes expert testimony by an accident reconstruction specialist as an accepted area of inquiry.
In this case, Sgt. Rawson expressed an opinion that the damage to Mrs. Im's van was consistent with having come into contact with the right front bumper of Wilson's Grand Prix. As a basis for his opinion, he relied on eyewitnesses' accounts of the accident, he had visited the scene, he viewed photos, and he had examined both vehicles. He explained that upon acceleration, a vehicle has a tendency to rise vertically. This would cause the damage to the victim's van to be slightly higher than the bumper of the defendant's Grand Prix. He was qualified to offer that opinion. Any objection made goes to the weight of this evidence and not its admissibility and the trial judge correctly admitted it. There is no merit to this assignment of error.

XIV.

WAS IT ERROR TO DENY WILSON A MANSLAUGHTER INSTRUCTION?
Wilson argues that he should have been granted an instruction that would have informed the jury that the murder was without malice and done in the heat of passion. The trial court refused that request on the grounds that the record contained no evidence from which the jury could determine that Mrs. Im's death resulted from heat of passion and not the result of malice. This refusal to grant the manslaughter instruction was based upon *1336 the trial judge's interpretation of Fairchild v. State, 459 So.2d 793, 801-02 (Miss. 1984), where we unequivocally said:
The manslaughter instruction was correctly refused because a manslaughter verdict could not on these facts have been reached solely by the jury's disbelieving a portion of the State's case. The jury could only have returned a verdict of manslaughter by finding affirmatively that Fairchild acted without malice aforethought and in the heat of passion, matters with respect to which there was no evidentiary basis in the record. Such matters may not be inferred.
Wilson argues that the jury was prevented from considering the manslaughter issue because he could not negate the presumption that the killing, having been done with a deadly weapon, was committed with malice. But in explaining its rationale for denying the manslaughter instruction, the trial judge said:
In Fairchild the decision was that where a deadly weapon is used, malice is implied and in order to overcome that, there must be some evidence in the record from which the jury could determine that it was not a result of malice, but a result of the heat of passion. There's no evidence in the record in this case ... following the dictates of Fairchild, it would seem that the manslaughter instruction should not be available since there is no evidence to overcome the implied malice from the use of a deadly weapon.
You don't get a manslaughter instruction unless there's some evidence that would support it, that there was some evidence that it was something other than malicious. That's what Fairchild stands for. It only stands for the proposition that you can't give an instruction unless there's some evidence to support it. And where there is no evidence to support anything  where there is evidence of malice arising out of the use of a deadly weapon, there has to be some circumstance that would allow the jury to infer there was something other than malice and there's no circumstance here.
In Lambert v. State, 462 So.2d 308, 315 (Miss. 1984), quoting from Jackson v. State, 337 So.2d 1242, 1255 (Miss. 1976), we said:
... when warranted by the evidence, the trial court may instruct the jury with reference to lesser included offenses. However, such an instruction should not be indiscriminately or automatically given, as was condemned in Roberts v. Louisiana, 428 U.S. 325, 335, 96 S.Ct. 3001, 3007, 49 L.Ed.2d 974, 982 (1976).
In Swanier v. State, 473 So.2d 180, 188 (Miss. 1985), we said:
... [T]here was no evidence which would support the giving of a manslaughter instruction. The state's evidence showed a robbery and repeated stab wounds to the victim. The victim was forced to remove cash both from a cash register and a floor safe. His jugular vein was slashed and he was also stabbed in the back. Under the defendant's version of the events, he had nothing to do with the stabbing of the victim. Therefore, there was no evidence warranting a manslaughter instruction.
In Pinkney v. State, 538 So.2d 329, 354 (Miss. 1988), cert. granted, vacated on other grounds, Pinkney v. Mississippi, ___ U.S. ___, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990), the defendant argued that he was entitled to a manslaughter instruction. In upholding the trial court's denial of such an instruction, we said, "This case is different. Pinkney's requested manslaughter instruction was completely at odds with his testimony that he never went to Hickman's house and did not even know where she lived. The evidence on this record did not entitle Pinkney to a manslaughter instruction."
Wilson's argument, that Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), serves as authority that he was entitled to a manslaughter instruction, has already been faced by this Court and rejected in Lanier v. State, 450 So.2d 69, 79 (Miss. 1984), where we held that Beck:
[U]nequivocally hold[s] that a manslaughter instruction is proper and essential `when the evidence warrants.' This, *1337 of course, accords with this Court's holding in Jackson v. State, 337 So.2d 1242, 1255 (Miss. 1976), where we held that instructions on a lesser included offense, `should only be given after the trial court has carefully considered the evidence and is of the opinion that such an instruction is justified by the evidence.' (citations omitted.)
In Fairchild, 459 So.2d at 802, this Court said that "[m]alice or intent ... may be proved or inferred from the use of a deadly weapon." Wilson maintains that this constitutes a "presumption of guilt" which the U.S. Supreme Court ruled unconstitutional in Mullaney v. Wilbur, 421 U.S. 684, 704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508, 522 (1975). Mullaney held that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." In that case, the defendant stated that he killed the victim "in a frenzy provoked by [the victim's] homosexual advance." 421 U.S. at 685, 95 S.Ct. at 1883, 44 L.Ed.2d at 511. Alternatively, that defendant asserted that, at the most, the homicide was manslaughter since it occurred in the heat of passion provoked by the homosexual assault. Because Wilson failed to properly present evidence to raise the manslaughter issue, the current case is distinguishable from Mullaney. Quite simply, Mullaney clearly fails to support Wilson's position.
Absolutely no evidence has been injected into this record which would change the character of this killing so that a reasonable jury might find that it was manslaughter. Fairchild, 459 So.2d at 802. Wilson was not entitled to a manslaughter instruction and this assignment of error is without merit.

XV.

DID THE TRIAL COURT ERR IN SENTENCING WILSON AS AN HABITUAL OFFENDER?
Wilson argues that because there was no showing on the faces of the sentencing orders of his two prior felony convictions that he made a "knowing and intelligent" plea of guilty, those two convictions may not be used to enhance his punishment. Phillips v. State, 421 So.2d 476, 481 (Miss. 1982). Wilson also argues that our law does not recognize "attempted criminal assault" as a crime. Therefore, one of the prior claims alleged by the State does not exist and Wilson would have only one prior felony conviction.
The indictment alleged that Wilson had been previously convicted of the crime of attempted criminal assault on June 7, 1971, in the Circuit Court of Hinds County, First Judicial District, Cause Number 20,337, and of the crime of robbery in the same court, Cause Number 20,338. It was further alleged that these convictions were based on charges separately brought and that they arose from separate incidents. Wilson's attorneys stipulated that he was convicted of those crimes. The record indicates that prior to the sentencing hearing on the habitual offender indictment, Wilson stipulated that these convictions were "free of constitutional defect." On this basis alone, Wilson's assignment of error is without merit. Bandy v. State, 495 So.2d 486, 491 (Miss. 1986).
As to Wilson's allegation that the attempted criminal assault conviction was invalid, Phillips requires that in determining a defendant's status as an habitual offender, the trial court:
... is not required to go beyond the face of the prior convictions sought to be used in establishing the defendant's status as an habitual offender. If, on its face, the conviction makes a proper showing that a defendant's prior plea of guilty was both knowing and voluntary, that conviction may be used for the enhancement of the defendant's punishment under the Mississippi habitual offender act.
* * * * * *
In fulfilling its mission to determine whether a prior conviction is constitutionally valid for the purpose of enhancing a defendant's sentence, the trial court must not be placed in position of "retrying" the prior case. Certainly any *1338 such frontal assault upon the constitutionality of a prior conviction should be conducted in the form of an entirely separate procedure solely concerned with attacking that conviction. (Emphasis added).
Phillips, 421 So.2d at 481.
This record reveals that Wilson knowingly and intelligently stipulated that he was convicted of these crimes and that the convictions were free of constitutional defects. The record also reflects that Wilson served time for these convictions. For the purposes of an habitual offender hearing, the issue is moot and this assignment of error has no merit.
Cause No. 89-KA-301, James Wilson, Jr. v. State of Mississippi was consolidated for the purposes of argument with Cause No. 89-KA-302. This second cause number deals with compensation for appointed counsel in death penalty cases.
For the purpose of decision in these cases, consolidation is no longer necessary and Cause No. 89-KA-302 remains in the bosom of the court.
However, in Cause No. 89-KA-301, we are of the opinion that none of the assignments of error have merit. Therefore, the conviction of James Wilson, Jr., of the crime of capital murder and his sentence to a mandatory term of life imprisonment are affirmed.
CONVICTION OF CAPITAL MURDER AND SENTENCE OF A MANDATORY TERM OF LIFE IMPRISONMENT AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, PITTMAN and BLASS, JJ., concur.
ANDERSON, J., not participating.